Karen TEMPLE, Appellant,

v.

Phillip TEMPLE, Cheryl McCauley, and N.T.,[1] Appellees.

No. 2009–CA–000044–ME.

Court of Appeals of Kentucky.

Nov. 13, 2009.

1. Pursuant to Court policy, children in custody cases are referred to by initials only.

John R. Milton, Booneville, KY, for appellant.

Melissa C. Howard, Jackson, KY, for appellee, Phillip Temple.

Kendall Robinson, Booneville, KY, for appellee, Cheryl McCauley.

No brief filed, for appellee, N.T.

Before NICKELL and WINE, Judges; HARRIS,[2] Senior Judge.

## OPINION

NICKELL, Judge.

This appeal flows from the filing of a custody petition by N.T.'s maternal grandmother, Cheryl McCauley. Karen Temple, the natural mother of N.T., appeals from an order entered by the Owsley Circuit Court on November 18, 2008, adopting the findings of fact, conclusions of law and decree proposed by a special domestic relations commissioner (DRC) who found Karen had waived her superior right to her son's custody by not seeking custody for herself; awarded custody of N.T. to Cheryl; allowed Karen and her father, Phillip Temple, to share visitation with N.T. at least one weekend of each month; and directed Karen to pay $60.00 to Cheryl each month in child support. After reviewing the record and the law, we affirm.

We begin with a brief description of the parties and the events spawning this appeal. As a child, Karen was placed through foster care in the home of Cheryl and Phillip and was ultimately adopted by them at the age of six. At the time of adoption, Karen was classified as being severely emotionally disturbed. A 1997 psychoeducational evaluation showed Karen to be in the moderate to mild range of mental retardation. When Cheryl and Phillip divorced in 1993, Karen chose to remain with Cheryl in Booneville, Kentucky. Phillip remarried and relocated about six hours away to Cadiz, Kentucky.

Cheryl is the full-time coordinator of a therapeutic rehabilitation program operated by Kentucky River Community Care. She is in reasonably good health and plans to retire soon. Phillip is retired from the military. He receives disability benefits and takes twenty-six different medications for diabetes, sleep apnea, high blood pressure, thyroid problems, a heart disorder, cholesterol problems, allergies, and stomach problems. He also takes medication prescribed by a psychiatrist.

Karen was seventeen and living with a boyfriend when she became pregnant in 2003. Five months into the pregnancy, after having a row with the boyfriend and

**2.** Senior Judge William R. Harris sitting as Special Judge by assignment of the Chief Justice pursuant to Section 110(5)(b) of the Kentucky Constitution and Kentucky Revised Statutes (KRS) 21.580.

his grandmother, Karen called Cheryl and asked if she could return home. Cheryl agreed and on February 14, 2004, a son, N.T., was born out of wedlock to Karen. About eight months later, it was established that Charles Hays was the child's father, and he began paying Karen $60.00 in monthly child support. Charles[3] is a convicted sex offender and is prohibited from having any contact with juveniles, including N.T. For the first twenty months of N.T.'s life, N.T. and Karen lived in Cheryl's home. During this time, Karen relied heavily upon Cheryl to feed, clothe, transport, and care for N.T. Both women agree the mother/daughter relationship was severely strained. According to Cheryl, Karen perceives any disagreement as abuse. Cheryl admitted that she and Karen had some physical altercations. During one of these occurrences, then two-year-old N.T. told the women to stop fighting.

In October 2005, with Cheryl's assistance, Karen moved to an apartment with N.T. but still relied heavily on Cheryl. Karen was investigated twice for neglect[4] but neither allegation was substantiated. Social workers testified N.T. did not obey Karen whereas he interacted positively with Cheryl. An assistant head start teacher testified N.T. was calmer with Cheryl and was physically aggressive toward Karen.

In April of 2007, Karen signed a note giving Cheryl permission to take N.T. for medical treatment when necessary. When the second neglect referral was made in the fall of 2007, Karen and Cheryl agreed that N.T. would live with Cheryl. At the hearing before the DRC, Karen begrudgingly admitted Cheryl "probably has" taken good care of N.T.

Karen's parental rights to her son have *not* been terminated, nor has a court found her to be an unfit parent. Since August of 2007, N.T. has lived full-time with Cheryl. In November of 2007, when Phillip took N.T. for a Thanksgiving visit and did not return him after the holiday weekend as he had promised he would, Cheryl petitioned the court to declare her a *de facto* custodian and award her permanent custody. Alternatively, if the court did not find she qualified as a *de facto* custodian, Cheryl asked that she be granted joint custody with substantial visitation rights. Cheryl was granted temporary custody until a hearing could be held and the matter resolved.

■ Karen filed a written response to the petition but she did not seek custody of N.T. for herself. Instead, she argued her father was the proper person to have custody because he would "prevent [Cheryl] from disrupting [N.T.'s] life with fighting and arguing" and would "allow [Karen] to maintain a close and peaceful relationship with [N.T.]." In her prayer for relief, Karen asked the court to "[a]ward custody of [N.T.] to Phillip Temple." Karen does not get along with Cheryl whom she claims has been "abusive and combative" towards her throughout her life. She is afraid Cheryl will not allow her to see her son and asked that Cheryl's petition be dismissed with prejudice and that Cheryl be denied all custody and visitation rights.

■ Following the hearing on June 26,

---

**3.** A warning order attorney was unable to locate Charles to apprise him of the custody petition filed by Cheryl. Charles did not attend or participate in any proceedings in this case. He has not requested custody for himself. However, by both telephone and in a notarized statement, he expressed his desire that Cheryl have custody of his son.

**4.** The record does not reveal the origin of the neglect allegations.

2008,[5] the DRC submitted proposed findings of fact and conclusions of law stating: even though N.T. had lived much of his life in Cheryl's home, she did not qualify as a *de facto* custodian because she was not his primary caregiver for a year as required by KRS 403.270(1)(a); nothing within their backgrounds prevented Cheryl or Phillip from caring for N.T.; the child's father, Charles, a convicted sex offender, was unfit due to the statutory prohibition on him having contact with juveniles; and there was no evidence in the record to suggest Karen was an unfit parent. Additionally, and of specific relevance to this appeal, the DRC wrote:

46. That leaves the question of whether Respondent Karen Temple has waived her superior right to custody. A waiver requires a "voluntary and intentional surrender of a known right, or an election to forego an advantage ..." *Vinson v. Sorrell,* 136 S.W.3d 465, at 469 (Ky.1995[2004]). In this case, the Petitioner claims that Respondent Karen Temple waived her superior right when she did not indicate in her pleadings that she is seeking custody. Respondent Karen Temple replied that her prayer for relief sought dismissal of the petition, which would return custody to her.

47. During her testimony, Respondent Karen Temple was asked repeatedly if she would keep [N.T.] if the court awarded her custody. Her response was always in the negative and that she would place the child with her father, Respondent Phillip Temple. The Court cannot and should not overlook the fact that Respondent Karen Temple is in reality not seeking custody. If she is not truly seeking custody, then she has waived her superior right to custody. All of the testimony about placement of the child following the court's decision dealt with the home of Petitioner Cheryl McCauley and Respondent Phillip Temple. For the Court to believe that Respondent Karen Temple is seeking custody would be to ignore the obvious.

48. Since Respondent Karen Temple has waived her superior right to custody, the custody decision is now between two non-parents, and the best interest of the child standard controls.

49. The testimony is clear [N.T.] has spent all of his life living in Owsley County, a larger portion of that time living with Petitioner Cheryl McCauley. Even when [N.T.] was living with his mother alone, Ms. McCauley was heavily involved in his life, providing financial support, emotional support and cared for [N.T.] many weekends, and saw him almost daily.

50. The testimony is also clear that [N.T.] thrives and does well educationally with Petitioner McCauley.

51. It is in the child's best interest to remain in the custody of Petitioner Cheryl McCauley.

52. It is clear that Respondent Phillip Temple loves his grandchild and is very capable of caring for [N.T.] as well, however, for whatever reason, he has not been a regular part of [N.T.'s] life and lives in an area [N.T.] is not familiar with. It would not be in [N.T.'s] best interest to uproot him and move him to a new town, a new home and new environment.

---

5. The hearing began on June 26, 2008, and concluded on July 2, 2008. The record on appeal contains a transcript of the testimony elicited on June 26. There is no transcript of the events that transpired on July 2. A letter from the reporting service to one of the attorneys in the case indicates problems with the speed of the audio recording prevented transcription of the entire hearing. We have attempted to listen to the cassette tape of the July 2 testimony without success.

As a result, the DRC recommended that Cheryl be awarded sole custody with Karen and Phillip sharing visitation with N.T. at least one weekend a month and that Karen pay Cheryl $60.00 each month in child support. Both Phillip and Karen filed exceptions to the DRC's recommendations arguing that Karen had not waived her superior right to custody of N.T. Cheryl's response to the exceptions maintained she qualified as a *de facto* custodian but agreed with the DRC's conclusion that Karen had waived her superior right to custody and that it was in N.T.'s best interest that the child be placed in Cheryl's custody. In adopting the DRC's findings and conclusions in an order entered on November 18, 2008, the court stated in pertinent part:

> When asked at the hearing if she wanted to keep [N.T.] or would rather Phillip keep him, Karen stated, "No, I'd rather my dad keep him," and she listed several reasons that Phillip and his wife are in a better position to parent [N.T.] than she is. When asked by Phillip's counsel if she wanted [N.T.] to live with Phillip, Karen stated, "Yes, I do. It would make me happy." When asked on cross examination if she was seeking custody herself, Karen answered, "No." In fact, it was not until she filed her exceptions that she asked for custody. From the time [N.T.] went to live with Cheryl in August 2007, Karen has visited with [N.T.] as she and Cheryl could agree. By Karen's own admission, she is giving up her superior right to custody to her father, who takes as many as 26 different medications (many on a daily basis) and lives in a community far away from the child and has not been the primary caretaker of the child since August 2007 as the Petitioner has been.

Therefore, the Court confirms the Commissioner's report, and although it may appear that there is a restriction on visitation, especially considering Karen's clear expression of her wish that Phillip have custody of [N.T.], considering [N.T.'s] age, Karen's admitted disability, and Phillip's use of medications, as well as the fact that Phillip lives in Cadiz, Kentucky, which the Court takes judicial notice is located in Trigg County in far-western Kentucky and necessitates a round trip from Owsley County of approximately 600 miles, and other factors set out in KRS 403.270, the Court is of the opinion that visitation as recommended by the Commissioner is reasonable.

It is from this order that Karen appeals. The sole question before us is whether the record supports the trial court's decision that Karen's failure to seek custody for herself constituted an express waiver of her superior right to custody. We are convinced it does.

As a reviewing court, we may set aside findings of fact only if they are clearly erroneous. CR [6] 52.01. Whether findings are clearly erroneous depends upon whether they are supported by substantial evidence in the record. CR 52.01; *Reichle v. Reichle*, 719 S.W.2d 442, 444 (Ky.1986). When findings are supported by substantial evidence, appellate review is limited to whether the facts support the legal conclusions drawn by the fact finder. We review legal conclusions *de novo*. *Brewick v. Brewick*, 121 S.W.3d 524, 526 (Ky.App. 2003). Finally, if the factual findings are not clearly erroneous and the legal conclusions are correct, the only remaining question on appeal is whether the trial court abused its discretion in applying the law to the facts. *B.C. v. B.T.*, 182 S.W.3d 213, 219 (Ky.App.2005).

**6.** Kentucky Rules of Civil Procedure.

■ Biological parents have a superior right to the custody of their children. KRS 405.020(1). However, there are circumstances under which that right may be waived. As stated in *London v. Collins,* 242 S.W.3d 351, 357–58 (Ky.App.2007),

> The Courts of the Commonwealth have consistently recognized a parent's superior right to the care and custody of his biological children and that he has a fundamental, basic and constitutionally protected right to raise his own children. *Moore v. Asente,* 110 S.W.3d 336 (Ky. 2003). Clearly, it is possible for a biological parent to relinquish or waive that superior right to custody. But it should not happen by accident, without the parent understanding or being advised what he is giving up, or without a specific finding by the court that such a waiver has occurred. In *Moore,* the Kentucky Supreme Court established the factors to be considered in determining whether such a waiver has occurred:

> > In determining whether parents have relinquished "physical custody" in a manner that confers standing upon a nonparent, Kentucky trial courts-like other courts that have addressed this issue-should consider, among other factors: (1) how possession of the child was acquired by the nonparent, especially the intent of the parents at the time of their relinquishment of the child to the nonparent; (2) the nature and duration of the possession by the nonparent; (3) the age of the child when possession was acquired by the nonparent and the child's age when the parents sought the child's return; (4) any visits by the parents during the nonparent's possession of the child; (5) any financial support by the parents during the child's stay with the nonparent; (6) the length of time between the relinquishment and the parent's efforts to secure the child's

> > return; and (7) what efforts the parents made to secure the child's return. Although we recognize that these factors cannot be applied mechanically as a formula to generate a conclusive answer as to the nonparent's standing, we believe these factors are useful analytical tools. We further recognize that although factors (1) and (2) will usually have the most importance, the other factors may also impact upon the determination.

*Id.* 110 S.W.3d at 358–59. A mother's waiver of her superior right to custody must be shown by clear and convincing evidence. It may be shown by "proof of a 'knowing and voluntary surrender or relinquishment of a known right.' " *Moore,* 110 S.W.3d at 360 (internal citation omitted). It may also "be implied 'by a party's decisive, unequivocal conduct reasonably inferring the intent to waive,' as long as 'statements and supporting circumstances [are] equivalent to an express waiver.' " *Id.* (internal citation omitted). Although "no formal or written waiver is required, statements and supporting circumstances must be equivalent to an express waiver to meet the burden of proof." *Vinson v. Sorrell,* 136 S.W.3d 465, 469 (Ky.2004) (footnote omitted).

In response to Cheryl's petition, Karen did not request custody for herself. Despite her argument to the contrary, asking the court to dismiss Cheryl's petition was not enough to defeat the petition and exert her superior right to custody. Moreover, Karen did not want custody of her son and admitted that if she were awarded custody she would give N.T. to her father. We deem this scenario to be factually distinct from *Diaz v. Morales,* 51 S.W.3d 451 (Ky. App.2001), relied upon by Phillip, wherein a biological mother did not immediately seek to regain custody of her minor daughter following her release from prison be-

cause of her financial situation. The case *sub judice* is not one in which a mother acquiesced in another person exercising custody of her son. This is a case of Karen openly and unequivocally declaring her desire that the court award custody of her son to her father as evidenced by her testimony during the hearing before the special DRC. When asked, "just so the record is clear on the situation, you are not seeking custody yourself, are you?" Karen responded, "No." Later in the proceeding when asked, "You've indicated in your response and you've testified here today ... you want custody awarded to your father[,]" Karen responded, "Uh-huh." Under these circumstances, we must conclude her failure to seek custody for herself is fatal to her appeal.

Furthermore, once the issue of custody was placed in the court's hands for resolution, Karen's wishes, as a biological parent, were not a controlling factor, but merely a factor for the court to consider in making its decision. In applying the *Moore* factors, N.T. began living in Cheryl's home full-time in August of 2007 while he was five years old. This arrangement resulted from an agreement reached by Karen and Cheryl following investigation of the second allegation of neglect, ultimately unsubstantiated, against Karen. While Karen visited with N.T. during this time and may have contributed to his care, it does not

appear she sought to change this arrangement until Thanksgiving of 2007, when Phillip picked up N.T. for a holiday visit without any intention of returning the child to Cheryl, and Karen visited with the child in Phillip's home during the holiday. Even then Karen did not seek custody for herself; she simply preferred that Phillip have custody of the child.

Following review of the record and the law, we agree with the trial court and hold Karen's testimony that she would give custody of N.T. to her father to be the "equivalent of an express waiver" of her superior right of custody under *Vinson*. The trial court's findings of fact are supported by the record, the court correctly applied the law to the facts, there has been no clear error and no abuse of discretion. Therefore, there is no basis for reversal on the issue of whether Karen expressly waived her superior right of custody to her son.

For the foregoing reasons, the order of the Owsley Circuit Court is affirmed.

ALL CONCUR.