FREDERICKS HOMBERG WICKER, Judge.
| ^Appellants, mother and maternal grandmother, complain of a trial court judgment awarding sole custody to the father, which is silent as to the mother and grandmother’s visitation rights beyond a transition period. While this appeal has been pending, the mother and maternal grandmother filed applications for supervisory writs complaining of subsequent trial court judgments addressing visitation. We have referred those writ applications to the merits of this appeal and address those issues herein.
In this case, the child’s father filed an action to modify a final, stipulated judgment awarding joint custody of the child to the maternal grandmother and the father, with the grandmother designated domiciliary, and granting visitation to the mother and father, the mother’s specific and limited, the father’s “reasonable.” Following a trial, the trial court granted the father’s petition, awarding the father sole custody of the child. The court’s judgment was silent on the issue of mother and grandmother visitation upon execution of the judgment.[1] The trial court ^subsequently denied the maternal grandmother visitation and awarded the mother limited, supervised visitation.
For the reasons fully discussed below, we find that the trial court committed two errors of law which materially affected the outcome of this case and implicated the substantive rights of the child, the grandmother, and the mother. First, the trial court committed an error of law when it placed the burden of proof upon the non-moving grandparent to show that substantial harm would result if sole custody of the child was granted to the moving parent.[2] Second, the trial court committed an error of law in awarding limited, supervised visitation to Tracie when it failed to make a “best interest” analysis or finding as required by La. C.C. art. 136.
As a matter of first impression, we adopt the standard enunciated by the Louisiana Second Circuit in Jones v. Coleman,[3] We find that the burden of proof in this modification action is upon the father, the parent seeking modification. First, we find the parent must prove, pursuant to the dual tests articulated in La. C.C. art. 133, that he has been rehabilitated of the parental unfitness or abandonment by reason of which he relinquished some part of his child’s custody to a nonparent, thereby eliminating the “substantial harm” threat to the child which existed when the stipulated judgment was signed. Second, if the parent proves that he has been rehabilitated, then the parent must prove that the adequate and stable environment in which the child has lived with the nonparent as a result of the stipulated judgment has materially changed. In the absence of such a change, the parent’s claim to modify the nonparent’s custody of the child shall fail. Jones v. Coleman, 44,543 (La.App. 2 Cir.7/15/09); 18 So.3d 153. If the parent bears the initial burden of proof and *785 passes the dual test articulated in La. C.C. art. 133, the Rparent must then prove that-the child’s best interest is in the custody of the parent. In any custody proceeding, the child’s best interest is predominant.
Having found that the trial court committed two errors of law which affected the outcome in this case and implicated the substantive rights of the parties and the child, we vacate the trial court’s January 27, 2015 judgment awarding sole custody to the father and reinstate the July 14, 2013 stipulated judgment awarding joint custody 'to the father and grandmother, with the grandmother designated as the domiciliary parent as well as the subsequent judgment concerning the parents’ child support , obligations and the father’s-visitation schedule. . Further, we vacate the trial court’s July 8, 2015 visitation judgment. We remand this matter to the district court.
Procedural History
Francisco (“Francisco”) and Tracie (“Tracie”) are the biological parents of David, who was born on May 29, 2006.[4] On November 17, 2006, Tracie petitioned the court for sole custody of David. Thereafter, on January 7, 2007, the parents consented to joint custody with Tracie being domiciliary parent. Reasonable visitation was reserved to Francisco. Francisco also agreed to pay Tracie $400.00 per month in child support and to maintain David’s health insurance.
On May 28, 2013, the maternal grandmother, Kathy B., and biological father, Francisco, filed a petition seeking a change of custody to joint temporary custody of David, with Kathy being designated as domiciliary parent, reserving to the mother, Tracie, reasonable visitation in Kathy’s home and visitation outside Kathy’s home only upon compliance with specific conditions. The petition also prayed that Francisco’s child support obligation cease upon the custody change.
iJn this petition, Kathy and Francisco alleged, pertinently:
-David lives with Kathy and his. maternal grandfather, Michael B., who are his primary care givers, attending to all of his rearing, emotional, academic, religious and life needs.
-Kathy and Michael B. take care of all of David’s food, clothing, school, extracurricular and medical expenses without support from Tracie who does not give them the $400,00 per month child support Francisco gives her.
-Francisco is not and has not been involved in David’s care, education, or upbringing and has visited with David infrequently, approximately once a year.
-Tracie’s day to day involvement with David is limited to picking him up after school for a couple of hours.
-Tracie has a long history of drug and alcohol abuse including inpatient rehabilitation in 2006; Tracie works as a bartender and stays out socializing after work. Tracie left containers containing alprazolam, carisprodol, clonazepam, and diazepam at the B’s' home. Tracie has been seen under the influence of alcohol or drugs when picking David up from school.
-Tracie has resumed her violent, chaotic relationship with Tim F. The relationship involves substance abuse, fights, cursing, yelling, threats against David, a hit and run accident, and a battery complaint.
*786 -Tim F. has been charged with battering Tracie, has been involved in two hit and run accidents, one in which he rammed Tracie’s car while extremely drunk, and a DWI. Tim F. has also threatened any man or little boy who interferes with his relationship with Tracie.
-Tracie has no residence and basically lives out of her car, staying with friends or Tim F. When she picks David up from school, she cannot seat belt him in because her car is filled with her belongings.
-David has returned home from time with Tracie with cigarette bums on his forearm and back.
-In October, 2012, David’s school recommended that he undergo a neurobeha-vioral evaluation because of his problems with attention, concentration, emotional issues and impulsivity. Tracie failed to arrange the evaluation, which Kathy eventually handled. David has been diagnosed with ADHD, with recommendations for home and school, including structure, scheduling, positive reinforcement and communication.
[fi-In order to meet David’s needs and follow through with the evaluation recommendations, David needs a stable home life as Kathy and Michael B. have provided without disruption from Tracie. -Custody to either parent would result in substantial harm to David, therefore the court is authorized pursuant to C.C. art. 133 to award custody to another person with whom David has been living in a wholesome and stable environment.
-Continued custody by Tracie would result in immediate and irreparable harm to David.
-It is in David’s best interest to award joint custody to Kathy and Francisco with David to continue residing with Kathy since Kathy has been his primary caregiver and Tracie has had little interaction with him and fails to take care of either his life or his financial needs, in spite of receiving child support.
In July, 2013, Kathy, Tracie, and Francisco agreed to a stipulated judgment awarding custody of David to Kathy, jointly with Francisco, with Kathy designated as the domiciliary parent.[5] The judgment granted Tracie specific visitation, unless otherwise agreed by the parties, conditioned upon certain terms, including the termination of Tracie’s relationship with her boyfriend and Tracie’s abstinence from alcohol or drug use evidenced by random drug testing. The judgment awarded Francisco unspecified reasonable visitation. Francisco approved the judgment by signature, pro se[6].
On March 24, 2014, Francisco filed a petition to annul the stipulated judgment. Tracie and Kathy were named defendants. Francisco prayed for sole custody of the child with reasonable visitation to the mother and the maternal grandmother. The father’s original petition alleged in relevant part:
[ 7-The maternal grandmother initially allowed the father visitation every other Sunday from 11 a.m. to 3 p.m. while the mother had more extensive visitation.
*787 -In January 2014, the maternal grandmother extended the visits to every other Sunday from 9:30 a.m. to 5:00 p.m. -The maternal grandmother refused the father alternate weekend overnight visitation.
-The maternal grandmother either never required the mother to be drug tested or failed to provide him with drug test results.
-The grandmother refused to confer with the father and has little communication with him, deferring communication to the grandfather who then deflects to her for a decision.
On August 7, 2014, Francisco filed an amended rale alleging that since the rendition of the July 14, 2013 Stipulated Judgment, circumstances have changed to such a material extent and degree affecting the welfare of the child to warrant a modification of custody:
-Since the rendition of the 2013 judgment, he has become an integral part of his child’s life, though limited by the maternal grandmother’s role as the “domiciliary parent.”
-The maternal grandmother does not exchange any information with him about any aspect of the child’s health, education and welfare as required under R.S. 9:336, including the child’s access to his mother.
-The child has expressed a strong preference to primarily live with his father and stepmother, as he should because a parent has paramount parental rights over a nonparent.
-The nonparent bears the burden of proof in an action to change custody awarded by a “non-eonsidered” decree and must show that an award of custody to the parent would result in substantial harm to the child.
On September 10, 2014, the parties attended a hearing officer conference resulting in an Interim Judgment, granting the child permission to contact either parent any day at any reasonable time. Francisco was ordered to pay child support |sof $819.42 per month to Kathy in two payments per month; Trade was ordered to pay Kathy $204.86 per month. Otherwise, the status quo was maintained.
A December 10, 2014 hearing officer conference resulted in a January 13, 2015 Interim Judgment which denied Francisco’s petition to annul, finding no change of circumstances and that “such a profound step as changing custody from the home where this child has lived practically since birth requires a trial before the district judge.” Francisco was awarded visitation with the child every other week from Friday at 6:00 p.m. until Monday morning.[7] Francisco was also awarded Christmas and New Year’s visitation. Francisco filed a timely objection to the denial of his petition to change custody and to accommodating the mother’s visitation, alleging positive drug tests.
Trial before the district judge of the Francisco’s objection to the January 13, 2015 judgment took place on January 15, 2015 and 27, 2015. At the conclusion of the trial, the court sustained Francisco’s petition to annul, vacated and annulled the July 14, 2013 stipulated judgment, awarding Francisco domiciliary, sole custody of the child. The court further provided for a transition period, ordering that the child complete the school year at the school he was attending in Kenner and that the visitation schedule set forth in January 13, *788 2015 interim judgment remain in place though the end of the school year. The judgment did not award Kathy visitation after May 2015. The judgment was also silent as to Trade's visitation after the transition period.
In his reasons for judgment, the trial judge found that Kathy failed to meet her burden of proving that granting David’s custody to Francisco would result in substantial harm to David, citing La. C.C. art. 183. The court further found that, to 19the contrary, the evidence adduced at trial proved that Francisco, as custodian, would provide David with a wholesome, stable, above adequate, loving, and structured environment to allow David to thrive. The court specifically referenced the non-considered nature of the stipulated judgment and recognized the parent’s paramount right to custody of his child.
Six days before trial in this matter, on January 9, 2015, Francisco filed a Petition for Protection from Abuse against Kathy, asserting allegations that Kathy and Michael had molested David. On January 29, 2015, the domestic commissioner tried the issues raised in Francisco’s Petition for Protection from Abuse and thereafter dismissed Francisco’s petition. Francisco filed no objection to that judgment and, therefore, that judgment is a final judgment as to the issues raised in Francisco’s January 9, 2015 Petition for Protection from Abuse.
Kathy and Tracie have appealed the trial court’s January 27, 2015 judgment awarding sole custody to Francisco. While this appeal was pending, Kathy filed a motion for visitation in the trial court, which the trial judge denied — finding that he lacked jurisdiction to consider the issue of visitation while the custody appeal was pending. On June 30, 2015, this Court granted Kathy’s writ of mandamus, finding that the trial court maintained jurisdiction to consider the issue of visitation and ordering the trial court to expeditiously conduct a hearing on visitation as to Kathy and Tracie. On July 8, 2015, the trial court conducted a hearing on visitation and issued a judgment denying Kathy visitation and awarding Tracie limited, supervised visitation.
FACTS
The following facts were presented at trial:
| wThe Time Period Between David’s May 29, 2006 birth and May, 2013[8]
Francisco is 42 years old. He was in his early 30’s when David was born. He has been employed with the Louisiana Department of Probation and Parole for approximately eight years. Before that, he worked for the Alcohol and Tobacco Control Board for four years. Francisco has been married twice, eight years to his current wife, Amanda. He had no children with either of his wives, although his stepdaughter, Regan, lives with him and Amanda. Francisco has fathered three children, Jake, age 11,[9] David, age 9, and *789 Olivia, who is older than Jake.[10]
Francisco met Tracie, with whom he hád a very brief relationship, shortly before Hurricane Katrina. Francisco and Tracie were never married, never lived together, and had no ongoing or committed relationship. When Tracie contacted him after the relationship had ended to inform him that she was pregnant, he asked her to terminate the pregnancy. She declined. David was born on May 29, 2006.
As to the period of time between David’s birth and the stipulated judgment in 2013, Francisco admitted that he had not been involved in David’s care, education, or upbringing and only visited David approximately once a year.[11] At trial, Francisco’s counsel eventually stipulated to the same effect.
Tracie has had a troubled history of drug and alcohol abuse, including inpatient rehabilitation in 2006. She had infrequent employment in various night In clubs and limited income. After David’s birth, throughout the next seven years, Tracie lived, at least at times, with Kathy and Michael (“the B’s”) and David. However, at some point she moved out, living, at least occasionally, with Tim F., her boyfriend or fiancé, with whom she had a volatile and chaotic relationship. Tracie continued to play a role in David’s life, though limited. Occasionally, she picked David up from school and stayed with him until his grandparents came home from work.[12] For the next eight years, Kathy and Michael served as David’s primary caregivers. . They provided all of David’s clothing; food, educational, extracurricular, and medical expenses without contribution from Tracie, despite the fact that she received $400.00 a month in child support from Francisco. They had no communication with Francisco and received no direct assistance from him.
For David’s first eight years, the B’s provided David with the love and affection, guidance and stability, moral, spiritual and emotional support every child needs to grow into a mentally and physically balanced mature adult. When David was three, the B’s saw to it that he was enrolled' in a parochial .school in Kenner. David has been at that school for six years, since 2009.[13] Kathy and Michael paid David’s tuition until sometime in his second grade year.[14] Thereafter, the B’s continued to pay a portion of David’s tuition, for his uniforms, and .school supplies. While Tracie picked David up from school some days and had some involvement at school, Kathy and Michael were David’s parent figures at school. Sometimes Tracie did David’s homework with him, but usually Kathy or Michael did. Kathy and Michael attended all school events, including opening day, parent-teacher | ^conferences, parent association meetings, special days, and the school fair. This role continued until the January 2015 trial.
In 2012, David’s teacher suggested to Tracie that David be evaluated for learning and psychosocial issues. The teacher thought that he was struggling with atten *790 tion, concentration, emotional issues and impulsivity. Tracie failed to set the evaluation in motion. When Kathy learned about the school’s request, she set up the evaluation. David was diagnosed with Attention Defícit/Hyperactivity Disorder (ADHD) with lengthy recommendations for home and school, including structure, scheduling, positive reinforcement and communication. Medication was also prescribed. From the time David was diagnosed until the January, 2015 trial, Kathy and Michael made sure that the recommendations were followed and that David took his medication.
Michael and Kathy also saw to David’s religious life, taking him to mass weekly, where Michael is a lector and Eucharistic minister and Kathy is involved in the children’s liturgy. They helped David prepare for first communion, and involved him in a vibrant church-social life with other families with children who attend their church. Michael and Kathy have also seen to David’s medical and dental needs. David sees the dentist annually and has had no cavities.
Kathy and Michael have also involved David in social and athletic activities. David has lots of friends. Michael and David ride bikes together, play football and walk David’s dog. They watch movies, read, play computer, card and board games. The B’s and David take vacations — to North Carolina, Biloxi, San Diego for family gatherings, a weekend for Labor Day in Houston to visit David’s best friend who moved there, and to baseball camp in Houston.[15]
11sThe B’s signed David up to play various sports such as football and baseball, which he has played for several years. Michael is one of his coaches. Kathy, Michael and Tracie attend David’s games. The B’s enrolled David in cub scouts and signed him up for Karate classes. Michael is David’s cub scout troop leader.
At trial, Francisco denied that Kathy was David’s primary caregiver for his first eight years.

The Time Period Between May, 2013 and July 14, 2013

In early 2013, Kathy and Michael became increasingly concerned with Tracie’s behavior, her ability to look after David, and David’s safety. Kathy, through counsel, reached out to Francisco to apprise him of the situation. Claire Durio, Kathy’s attorney, informed Francisco that Tracie was having issues with drug use and prescription medication abuse and that she was in an abusive relationship with her boyfriend. She told him David had witnessed physical fights between Tracie and her boyfriend. Ms. Durio explained that Kathy wanted to file a petition to take custody away from Tracie because she believed David was in danger.
On May 28, 2013, Kathy and Francisco filed a joint petition to change custody. The Time Period Between the July 14, 2013 Stipulated Judyment and the March 24, 2014 Petition to Annul Judyment
Francisco did not participate in David’s summer 2014 activities. In September or October, 2014, he began seeing David occasionally on Sundays for a few hours. Beginning in January, 2014, Francisco began seeing David every other Sunday, from 9:30 a.m. until 5:00 p.m.
| ^During David’s 2013-2014 school year, Kathy and Michael were primarily responsible for David’s education,, including homework, attendance at school functions, and all other school-related activities. Francisco spoke with Debra T., David’s *791 first grade teacher, once by telephone for five minutes. He did not visit David’s school. Tracie occasionally picked David up from school and did his homework with him, but was not consistent in that effort.
Shortly before Mardi Gras, 2014, Francisco told Michael that he would be interested in additional visitation, but that he would be working the N.B.A. All Star Game and Mardi Gras for the next four weekends, and, therefore, would be unable to see David in February 2014. The parties had no further communication regarding weekend visitation until Francisco filed his Petition to Annul the stipulated judgment on March 24, 2014.

The Time Period Between the March 24, 2014 Petition to Annul the Stipulated Judgment and the January 27, 2015 Trial

Around Easter (April) of 2014, the parties agreed to a weekend visitation schedule. On December 11, 2014 that schedule was extended by interim judgment from every other weekend from Friday after school through Sunday afternoon to Friday after school until Monday morning.
Francisco testified that at time of trial his relationship with David had changed. He and David do lots of things together. When David goes to Slidell, they hunt and fish. They spend time with Francisco’s and Amanda’s families, who are close by. David plays football and basketball with all of the cousins. They camp a lot and David loves it. While David doesn’t bring homework to Slidell, Francisco and he read together. David and Amanda cook together and he has a great relationship with Regan and Jake. Francisco and David talk on the phone hfievery evening when David isn’t with him. Amanda agrees that David is fully integrated into their family, and she is fully supportive of David living with them.
During the period after Francisco filed his petition, David continued to live with the B’s and his schedule and life with them remained the same. David was in the second grade, he continued in cub scouts, karate and baseball. He went to church with them weekly and was preparing for first communion.
Tracie continued to be a part of David’s life, though in the limited capacity set forth in the stipulated judgment. Tracie continued to pick David up from school sporadically, and David continued to go to aftercare until the B’s picked him up on other days.
During this period, Francisco did not participate in David’s Kenner-based baseball and cub scout activities. He attended David’s cub scout Christmas party and occasionally picked him up from karate on Fridays for weekend visitation. He also remained largely uninvolved in David’s religious life.
Neither Francisco nor Tracie was involved in preparing David for the 2014-2015 school year. Kathy and Michael continued to take care of David’s school related needs. During that school year, up until trial, Francisco had met David’s teachers and had been to David’s school three times. Francisco did understand that David has ADHD, but was otherwise ill informed on that issue.
Between July 14, 2013, and September 10, 2014, neither Francisco nor Tracie had a child support obligation. Francisco gave Kathy $600.00 during that period. The record is silent as to Tracie’s financial contribution to David’s support during this period. On September, 10, 2014, the court ordered Francisco to pay $819.42 per month and Tracie to pay $204.86 per month.
*792 | ^^Relationship and Cooperation between the Father, Mother and Maternal Grandmother
The record reflects that Francisco and Kathy and Michael struggled to communicate with and to support each other effectively, eventually settling upon text message communication. While both Kathy and Michael and Francisco accuse the other of misdeeds, what is apparent is that all .parties are struggling to understand and respect the rights and responsibilities of the domiciliary parent, the concept of co-parenting, and the negative impact of strife between the involved adults upon David. Francisco accuses Kathy of failing to adequately communicate to him concerning Trade's substance abuse status and frequency of visitation with David and opines that Kathy is responsible to report to him, as David’s father, full details of David’s life daily. He also accuses Kathy of telling David things he need not know, of making negative comments about him, and of failing to invite him to the various events in David’s life. Francisco accuses Kathy of fighting his relationship with David every step of the way. Kathy details the information she has given Francisco to allow him to participate in David’s Kenner based activities should he choose to and responds that she asked Francisco to spend more time with David through her lawyer and, in the face of Francisco’s rude, hostile and overbearing behavior, has tried to maintain a civil relationship because that is what is best for David. She testified that she appropriately handled her responsibility as domiciliary parent to monitor Trade's substance abuse status. Kathy, likewise, accuses Francisco of making negative comments about her, of promising David to do things with him without discussing them with her first, of pressuring David to say that he wants to live with him, of failing to inform her of plans he has with David, and of using David as a message carrier about the specifics of her parenting about which he disapproves. It appears that at some point, Kathy abdicated all Indirect communication with Francisco to Michael. Michael appears to have taken on the role of ombudsman. There is no evidence of any communication between Tracie and Francisco.
Facts Related to the July 8, 2015 Visitation Hearing as to Kathy[16]
Following Kathy’s writ of mandamus filed in this Court, we ordered the trial court to conduct a hearing to determine Kathy and Tracie’s visitation rights while the appeal of the January 27, 2015 custody judgment is pending. On July 8, 2015, the trial court conducted a visitation hearing. At the July 8, 2015 hearing, Kathy testified that she has a loving, close relationship with David and that her circumstances and home environment remained the same as when David resided with her.
Contrary to previous assertions to the court made during the January, 2015 trial, Francisco contested visitation to either Kathy or Tracie. As to Kathy, Francisco reasserted the molestation allegations contained in his January 9, 2015 Petition for Protection from Abuse, which was tried on January 29, 2015 before the domestic commissioner. At the conclusion of that hearing, the domestic commissioner dismissed that petition. Francisco did not object to that finding to seek a hearing in the district court. Therefore, the domestic commissioner’s January 29, 2015 dismissal is a final judgment on those issues. Nevertheless, the trial court heard testimony on these allegations. According to Francisco, on the evening of Sunday, December 14, *793 2014 — foui[1] days after the hearing officer issued a recommendation denying his petition to annul the stipulated judgment— David.told him that when his penis hurts and he is in the tub, his grandmother or 11sgrandfather would put soap and water on it, wash it extensively, and then softly dry it. David also told him that when David had an infection in his penis, his grandfather squeezed the “goo” out of his penis while he lay on the bed. Francisco also testified that David told him Michael peeked into his bedroom when he was changing, that Kathy told Michael to stop it, and that David thought it was funny. Finally, he testified that David told him that he had taken a shower with his friend, Patrick. David was eight years old at the time he allegedly showered with his friend. Francisco did not discuss these events with Kathy or Michael prior to filing his Petition for Protection from Abuse.
Francisco further testified that he understood that David had suffered from a penile infection, at least once. Trade testified that David, who is uncircumcised, suffers from yeast infections in his penis, for which medical care and parental treatment is necessary. Francisco did not testify that he has ever taken David to a pediatric urologist concerning these infections and he called no pediatric urologist at the hearing to testify as to the proper treatment of a child suffering from a penile infection.
Francisco testified that in December 2014, he also reported the molestation allegations to the Kenner Police Department and to the Louisiana Department of Children and Family Services (DCFS). Francisco testified that Kenner Police had an active molestation case against Kathy and that DCFS had also verified the complaint. However, on cross examination, Francisco admitted that DCFS had closed its case and permitted Michael to return to his home with Kathy and David. It appears that this would have occurred between January and May, 2015, while |19Pavid was still living with Kathy and Michael. As to the Kenner Police Department, the record contains no evidence of an ongoing, active investigation.[17]
Further, while the trial judge excluded testimony concerning the molestation allegations at the January 27, 2015 trial, the record reflects that the trial judge was' aware of the allegations in the Petition for Protection from Abuse. At the conclusion of the January 27, 2015 trial the trial judge returned the child to Kathy’s home until the last day of the school year, May 27, 2015, with no restriction upon Michael from living at his home with Kathy and David during that four-month period.
At the July 8, 2015 visitation hearing, Francisco presented no new molestation allegations, not already addressed by the domestic commissioner’s January 2015 judgment. Kathy was not questioned during the hearing about these allegations.
LAW AND ANALYSIS,
On appeal, the maternal grandmother argues that the trial court erred in applying the wrong standard of proof in its modification of custody between a parent and a nonparent and that'the burden of proof was placed on the wrong party. In the alternative, the maternal grandmother argues that, should this court find that *794 granting custody to the father was appropriate, the trial court manifestly erred in failing to grant her visitation rights.
The crux of this case is the confluence of two powerful and basic principles: the child’s substantive right to live in a custodial arrangement which will serve his best interest and a parent’s constitutional right to parent his child.
12pl
The heart of this matter rests in the best interest of a nine year old boy. It is well settled that, while each custody case must be viewed in light of its own particular set of facts and circumstances, the paramount consideration in any determination of child custody is the best interest of the child. Lehr v. Robertson, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983); McCormic v. Rider, 09-2584, pp. 3-4 (La.2/12/10), 27 So.3d 277, 279 (citing Evans v. Lungrin, 97-0541, 97-0577 (La.2/6/98), 708 So.2d 731); La. C.C. art. 134. “The best interest principle recognizes the child’s substantive right to the custodianship that best promotes his welfare. The protection of the child’s substantive right is paramount even when the contestants for the child’s custody are not the parents but one parent and a grandparent.” Onderdonk v. Onderdonk, 547 So.2d 1138 (La.App. 5 Cir.1989).
II.
The Fourteenth Amendment prohibits States from depriving persons “of life, liberty, or property, without due process of law.” See U.S. CONST, amend. XIV, § 1. As the Supreme Court recently reaffirmed, “We have long recognized that the [Fourteenth] Amendments Due Process Clause .... guarantees more than fair process. The Clause also includes a substantive component that provides heightened protection against government interference with certain fundamental rights and liberty interests.” Troxel v. Granville, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) (plurality opinion) (quoting Washington v. Glucksberg, 521 U.S. 702, 719-720, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997)).
The interest of a parent in having a relationship with his children is manifestly a liberty interest protected by the Fourteenth Amendment’s due process guarantee. Jones v. Coleman, 44,543 (La.App. 2 Cir. 7/15/09), 18 So.3d 153, (citing Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923)); Prince v. Massachusetts, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944). The United States Supreme Court has declared it “plain beyond the need for multiple citation” that a biological parents’ right to “the companionship, care, custody, and management” of his children is a liberty interest far more important than any property right. In re Adoption of B.G.S., 556 So.2d 545 (La.1990), citing Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) and Lassiter v. Department of Social Services of Durham County, N.C., 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981).
What is the nature of this fundamental liberty interest and when does it arise?
Troxel v. Granville, supra, is the U.S. Supreme Court’s most recent iteration on this fundamental right. In Troxel, a plurality of the Court, with Justice O’Connor writing, struck down the Washington State grandparent visitation statute in large measure due to its “breathtakingly broad” scope which allowed “any person,” including a grandparent, to petition for visitation rights at any time, if it was in the best interests of the child. 530 U.S. at 63, 120 S.Ct. 2054. The central problem with the statute, according to the plurality, was that it failed to accord a fit parent’s decision *795 “any presumption of validity or any weight whatsoever.” Id. at 67, 120 S.Ct. 2054.
Justice O’Connor, however, also emphasized two basic points: the fitness of the parents in that case and the demographic changes in the typical American family structure over the past century.
In Troxel, the mother was fit. The Court emphasized the presumption that fit parents act in the best interests of their children. Accordingly, the Court explained that “so long as a parent adequately cares for his or her children (i.e., is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions 122concerning the rearing of that parent’s children.” Id. at 68-9, 120 S.Ct. 2054 (citing Reno v. Flores, 507 U.S. 292, 304, 113 S.Ct. 1439, 1448, 123 L.Ed.2d 1, 18 (1993)). The Court held that a court that reviews a fit parent’s decision regarding grandparent visitation “must accord at least some special weight to the parent’s own determination.” The Court, however, specifically declined to define the precise scope of the parental due process right in the visitation context.
Discussing the changes in the make-up of the average American family, the court wrote:
The demographic changes of the past century make it difficult to speak of an average American family. The composition of families varies greatly from household to household. While many children may have two married parents and grandparents who visit regularly, many other children are raised in single-parent households. Id. at 63-64, 120 S.Ct. 2054.
The Court relied upon 1996 census figures to support its statement that persons outside the nuclear family, frequently grandparents, are called upon more and more frequently to assist in the everyday tasks of child rearing.
Today, the landscape has evolved further. In 2012, approximately 119,416 grandparents lived in 81,245 Louisiana households with their grandchildren.[18] Research further shows that 68,000 of these grandparents were their grandchildren’s primary caregiver and 25,000 of those children, being raised by their grandparents, have been with their grandparents for five years or more. Id. This does not take into consideration the children who are being raised by aunts, uncles, cousins, siblings or family friends. Nationally, about 2.7 million grandparents were “grandparent caregivers” defined as those who have primary Irresponsibility for grandchildren under the age of 18 who live with them. Id. About 10% of all U.S. children live with a grandparent. In the years between 1970 and 1990, the typical grandparent/grandchild home shifted from one in which a parent was present to a home in which no parent was present. The largest percentage of children who live with a grandparent live with their mother with no father present. The southern and southwestern states have the largest percent of children living in their grandparent’s homes. Id.
Returning to the question, when does a parent’s constitutional right to parent his *796 child arise and what is the breadth of that right?
In Lehr v. Robertson, the United States Supreme Court, with Justice Stevens writing for the six justice majority, explored the precise nature of the biological father’s liberty interest in the care, custody and control of his child. The question before the Court was “whether New York has sufficiently protected an unmarried father’s inchoate relationship with a child whom he has never supported and rarely seen in the two years since her birth.” Lehr v. Robertson, 463 U.S. 248, 249, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983). In its opinion, the Court emphasized the overarching and overriding concern for the best interest of the child as well as the parent’s concomitant rights and responsibilities, finding that parental rights neither begin, nor parental responsibilities end, with conception:
When an unwed father demonstrates a full commitment to the responsibilities of parenthood by ‘[coming] forward to participate in the rearing of his child,’ ... his interest in personal contact with his child acquires substantial protection under the Due Process Clause. At that point it may be said that he ‘[acts] as a father toward his children.’ .... But the mere existence of a biological link does not merit equivalent constitutional protection. The actions of judges neither create nor sever genetic bonds. ‘[The] importance of the familial relationship, to the individuals involved and to society, stems from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in ‘[promoting] a way of life’ though the instruction of children ... as well as from the fact of blood relationship.
124Id. at 261, 103 S.Ct. 2985. (Citations omitted)
The Court analyzed the question before it in the context of the “precisely three” earlier cases in which the Court was called upon to examine the extent to which a natural father’s biological relationship with his child receives protection under the Due Process clause: Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); Quilloin v. Walcott, 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978); and Caban v. Mohammed, 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979). The court differentiated the Stanley and Caban cases, which involved fit fathers, from the Quilloin case, which involved a father who had visited with the child on “many occasions,” given the child toys and gifts “from time to time” and provided support on an “irregular basis.” In doing so, the Court drew a clear distinction between a mere biological relationship and an actual relationship of parental responsibility. Id. at 259-260, 103 S.Ct. 2985.
In Lehr, the United States Supreme Court emphatically held:
The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child’s future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child’s development. If he fails to do so, the Federal Constitution will not automatically compel a State to listen to his opinion of where the child’s best interests lie.
Id. at 262, 103 S.Ct. 2985. (Emphasis added).
The Lehr case, however, does not stand for the proposition that a natural father must live continuously with his child in order to enjoy his fundamental constitutional rights as a parent. Even when a *797 natural father has not lived continuously with his child, he enjoys the constitutional protection of his paternal interest when he has developed and maintained a substantial relationship with his child by accepting responsibility for the child’s future. In re Adoption of B.G.S, 556 So.2d 545 (La.1990) (citing Lehr v. Robertson, supra).
las At the end,, as the United States Supreme Court has repeatedly stated, a parent’s constitutional right to parent his child does not arise by the mere circumstance of his child’s birth. Rather, his liberty interest to parent his child arises with his demonstration of a full commitment to the responsibilities of parenthood by coming forward to participate in rearing his child.
III.
We are faced for the first time with the question of the applicable standard and burden of proof in a custody modification conflict between a parent and a nonparent in a case in which the judgment sought to be modified is a non-considered judgment, in which the nonparent was designated as domiciliary status.[19] While the other Louisiana circuit courts have addressed this issue, there is inconsistency among and within the circuits as to both the standard of proof and the burden of proof to be applied.
While the First, Second and Fourth Circuit courts each place the burden of proof upon the modification-seeking parent, consensus is absent among those three circuits as to the standard of proof. In the First and Fourth Circuits, the modification-seeking parent must prove both a change in circumstances and that the proposed custody arrangement is in the child’s best interest. Millet v. Andrasko, 93-520 (La.App. 1 Cir. 3/11/94), 640 So.2d 368, 370-71; In re Hardimon, 99-1569 (La.App. 4 Cir. 1/05/00), 751 So.2d 989, 993. In the Second Circuit, the modification-seeking'parent must first demonstrate his rehabilitation, which eliminates the “substantial harm” threat to the child which existed at the time of the initial judgment. Jones v. Coleman, 44,543 (La.App. 2 Cir. 7/15/09), 18 So.3d 153, 164. Second, the parent must establish that the adequate and stable 1 gr,environment in which the child was originally placed with the nonparent has materially changed. Id.
The Third Circuit, however, has issued conflicting decisions on this issue. Compare Cutts v. Cutts, 06-33 (La.App. 3 Cir. 5/24/06), 931 So.2d 467, 470, wherein the court held that the nonparent must show that a custody award to the parent will result in substantial harm’ to the child, to Dalme v. Dalme, 09-524 (La.App. 3 Cir. 10/14/09), 21 So.3d 477, 478, writ denied, 09-2560 (La.1/8/10), 24 So.3d 868, wherein the court seems to apply the burden to the modification-seeking parent to prove a change of circumstances, similar to the standard and burden of proof followed in the First and Fourth Circuits.
Today, child custody in Louisiana is controlled by Louisiana Civil Code articles 131 to 136. The best interest of the child is the overriding test applied in all child custody determinations. La. C.C. art. 131; Ramirez v. Ramirez, 13-166 (La.App. 5 Cir. 8/27/13), 124 So.3d 8, 17-18, (citing McCormic v. Rider, 09-2584, pp.3-4 (La.2/12/10), 27 So.3d 277, 279 (citing Evans v. Lungrin, 97-0541, 97-0577 (La.2/6/98), 708 So.2d 731)). While Louisiana law is settled in both initial custody contests between a nonparent and a parent, and in a parent’s action to modify a *798 considered decree awarding custody to a nonparent, the law is unsettled among, and perhaps, within, the Louisiana circuits as to both the burden and standard of proof in a parent’s action to modify a previous consent judgment awarding custody to a nonparent.
Initial Custody Contests Between a Parent and a Nonparent
The initial determination of custody between a parent and nonparent is governed by Louisiana Civil Code article 133:
If an award of joint custody or of sole custody to either parent would result in substantial harm to the child, the court shall award custody to another person with whom the child has been living in a wholesomej^and stable environment, or otherwise to any other person able to provide an adequate and stable environment.
In such an initial custody contest, parental primacy dictates that when the parent competes with a nonparent, the parent’s right to custody is superior unless the parent is unable, unfit, or unwilling, having forfeited parental rights. Jones v. Coleman, 18 So.3d at 158 (citing Wood v. Beard, 290 So.2d 675 (La.1974)). Therefore, a heightened standard of proof applies in these initial custody battles. See, e.g., Tennessee v. Campbell, 28,823, p.6 (La.App. 2 Cir. 10/30/96), 682 So.2d 1274, 1278; Caples v. Caples, 47,491 (La.App. 2 Cir. 7/25/12), 103 So.3d 437; Black v. Simms, 08-1465 (La.App. 3 Cir. 06/10/09), 12 So.3d 1140, 1144. The nonparent bears the burden of first proving by clear and convincing evidence that substantial harm will result to the child if the custody is not changed to a nonparent. Ramirez v. Ramirez, 124 So.3d at 17; Rupert v. Swinford, 95-0395 (La.App. 1 Cir. 10/6/95), 671 So.2d 502, 505. If the nonparent meets •this initial burden, the nonparent, in order to prevail, must then prove that joint or sole custody to the nonparent is in the best interest of the child. Millet v. Andrasko, 640 So.2d at 370.
La. C.C. art. 133 Comment (b) states that while “substantial harm” is a change in terminology from the previous law, it is not entirely new to Louisiana jurisprudence. In pertinent part, that comment provides:
Prior to the 1982 introduction of the two-part statutory test that parental custody be shown to be “detrimental” to the child and that divestiture be “required to serve the best interest of the child,” the courts had followed the jurisprudential formula: “the parent ... may be deprived of ... custody only when (he) has forfeited his or her right to parenthood, ... is unfit, or ... is unable to provide a home for the child.” La. C.C. art. 133, cmt. (b) (citing Deville v. LaGrange, 388 So.2d 696, 697-98 (La.1980)).
12sThe Article 133 continuum of substantial harm is broad and wide ranging, including parental unfitness, neglect, abuse, abandonment of rights, and “any other circumstances, such as prolonged separation of the child from its natural parents, that would cause the child to suffer substantial harm.” Ramirez v. Ramirez, 124 So.3d at 16; Jones v. Coleman, 18 So.3d at 159.
Custody Contests Following a Considered Decree
Likewise, in Louisiana it is clear that in a custody contest wherein a parent is seeking to modify a considered decree awarding custody to a nonparent, the parent bears the heavy burden of meeting the Bergeron standard.[20] Millet v. Andrasko, *799 supra; Mills v. Wilkerson, 34,694 (La.App. 2 Cir. 3/26/01); 785 So.2d 69; Willis v. Duck, 98-1898 (La.App. 3 Cir. 5/5/99) 733 So.2d 707; Kinler v. Kinler, 99-241 (La.App. 5 Cir. 8/31/99), 743 So.2d 267.
The Bergeron test requires either (1) a showing that the continuation of the present custody in the nonparent is so deleterious to the child as to justify a modification of custody or (2) proof by clear and convincing evidence that the harm likely to be caused by a change of environment is substantially outweighed by the advantages a change affords the child. Bergeron v. Bergeron, 492 So.2d 1193, 1200 (La.1986).
Therefore, in an action by a parent to modify a considered decree awarding custody to a nonparent, the parental primacy rule does not apply. Jones v. Coleman, supra.
IV.
Given the inconsistency between, and at times within, the Louisiana Courts of Appeal as to both the standard and burden of proof to be applied in a custody | ^modification dispute between a parent and a nonparent in a circumstance in which the custody order sought to be modified is a consent or stipulated order, ergo, a non-considered decree, a review of the law within each Louisiana Circuit is in order.

Second Circuit

Because the Second Circuit has undertaken the most exhaustive review of the law on this issue to date, we begin there.
In Jones v. Coleman, supra, the Second Circuit announced the standard and burden of proof to be applied in this situation, rejecting its earlier analysis and holding elucidated in Tennessee v. Campbell, supra. The Jones father entered into a consent judgment with the grandparents providing them with custody, with the father granted visitation. In the father’s subsequent custody action, he argued that his constitutionally-protected right of parental primacy required that primary custody of the child be transferred to him, despite the fact that his child had lived with his grandparents for his entire four-year life. In Jones, the trial court rejected that argument, allowing the child’s custody to remain in the “excellent” environment of care that the grandparents had continuously provided. The Second Circuit affirmed the trial court’s judgment, basing its decision upon the La. C.C. art 133 provisions for the award of custody to a nonparent.
After analyzing the parties’ and child’s competing rights and interests, and the two previous lines of cases that previously addressed this issue in the context of La. C.C. at 133,[21] the court rejected both lines of cases, and announced the standard and burden of proof which it would apply in this instance:
[T]he initial judgment under Article 133, placing custody of the child with a non-parent, is a determination of the unfitness of the parent and the fitness of the nonparent to provide an adequate and stable |,^environment. The considered versus nonconsidered decree analysis under Evans and Bergeron does not apply for the consideration of the initial judgment’s effect in any future action for the modification of the nonparent’s custody. In any proceeding thereafter to restore custody of the child to the *800 parent, and to thereby modify or end the nonparent’s custody, the parent shall have the burden of proof and the dual tests of Article 133 shall apply. First, the parent must demonstrate his rehabilitation which eliminates the “substantial harm” threat to the child which existed at the time of the initial judgment. Second, the parent must establish that the adequate and stable environment in which the child was placed with the nonparent as a result of the initial adjudication has materially changed ... rehabilitation of the parent alone shall afford him only an appropriate visitation allowance under La. C.C. art. 136.
Jones v. Coleman, 18 So.3d at 164.
The Second Circuit based its holding first upon the Louisiana Legislature’s pronouncement in La. C.C. art. 133’s language that, in custody contests between parents and nonparents, the focus must be upon the duel concerns of the risk of substantial harm to the child and the importance of a child being raised in a consistent, stable, wholesome environment. The court ultimately concluded that, as these important criteria were the measure by which a non-parent receives custody, they must likewise be the measure by which custody will be returned to a parent.
Turning first to the “substantial harm ” prong of the dual La. C.C. art. 133 test, the court reiterated its earlier pronouncement that the continuum of “substantial harm to the child” is wide ranging, citing Mills v. Wilkerson, 34,694 (La.App. 2 Cir. 3/26/01), 785 So.2d 69. Acknowledging the obvious difference between a parent who physically abuses his child, subjecting him to prosecution under Title 10 of the Children’s Code, and a parent whose immaturity or neglect for the child renders him unfit to parent, the court nevertheless, again, opined that “substantial harm” is broad enough to include parental unfitness, neglect, abuse, abandonment of rights and, importantly, “any other circumstances, such as | .¾ prolonged separation of the child from its natural parents.” Jones v. Coleman, supra, at 159.
Turning next to the La. C.C. art. 133 dictate of a custody award being to: “... another person with whom the child has been living in a wholesome and stable environment,” the court pointed out that both the Louisiana Supreme Court and Legislature have repeatedly focused upon this factor as key to a child’s best interest.
In early cases, the Louisiana Supreme Court, even in initial custody disputes, elevated the best interest of the child and stable environment factors to reject parental primacy claims against the nonparent with whom the child resided. State ex rel. Paul v. Peniston, 235 La. 579, 105 So.2d 228 (1958); State ex rel. Graham v. Garrard, 213 La. 318, 34 So.2d 792 (1948).
Next, when the Louisiana Legislature codified the factors the court should consider in determining the best interest of the child, in 1994, two of those factors were “the length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment,” and “the responsibility for the care and rearing of the child previously exercised by each party.”
The Second Circuit next considered and rejected the two distinct lines of cases 'that had developed to address modification of nonparent custody decrees. First, the Bergeron/Evans inspired line of cases draw upon the jurisprudentially developed auxiliary rules for modification of custody decrees between two parents.[22] Under *801 this line of cases, the parent seeking modification always bears | ¡¡2the burden of proof, by the standards enunciated in Ber-geron and Evans, to modify the nonpar-ent’s custody.[23]
In the second line of cases, the Third Circuit focused upon a parent’s paramount right of custody to place the burden of proof upon the custodial nonparent to continue to prove by clear and convincing evidence that substantial harm to the child will result if custody is returned to the parent.[24] Cutts v. Cutts, supra.
The court first distinguished the usual factual scenario of a parent versus parent custody contest ensues from the factual scenario of a nonparent versus parent custody battle. In initial parental custody proceedings between two parents, neither parent is expected to pose a risk of substantial harm to the child, and both parents are expected to share in custody and serve the best interest of the child. Under La. C.C. art. 132, unless the best interest of the child requires otherwise, the court is mandated to accept the parent’s agreement for parental shared custody. On the contrary, to even state a cause of action in a nonparent versus parent situation under La. C.C. Art. 133, the threat of the parent presenting “substantial harm to the child” along with the alleged ability of the non-parent to provide a “wholesome and stable environment” in the best interest of the child must be present. The court found the forced analogy to parental consent judgments to be inapposite. Jones, supra, at 163.
Focusing again upon the typical factual scenario in which a nonparent versus parent custody proceeding arises, the court concluded that the initial Article 133 judgment, whether consensual or considered, is a determination of the unfitness of |3Sthe parent, thereby vitiating the parent’s paramount right to custody, shifting the burden of proof in a subsequent modification proceeding to the parent.
Finally, the Second Circuit also concluded that the initial Article 133 judgment placing the child’s custody with a nonpar-ent is a determination of the nonparent’s fitness to provide an adequate and stable environment.
Therefore, the court rejected both previous lines of cases, announcing that in any subsequent modification proceeding, the parent has the burden of proof and the Article 133 dual tests apply.

Third Circuit

In Mayeux v. Mayeux, 93-1603 (La.App. 3 Cir. 6/1/94), 640 So.2d 686, the Third Circuit had held that in these circumstances a parent seeking to regain custody from a nonparent bore the burden of proof and must show a material change in circumstances and that a change of custody would be in the best interests of the child. However, in 2006, in Cutts v. Cutts, supra, the Third Circuit, with Judge Pickett dissenting, specifically followed the Second Circuit’s decision in Tennessee v. Campbell, supra, rejected its earlier enunciated standard governing these situations, and announce a new standard and burden.
We conclude that in determining the best interest of the child, the nonparent bears the burden of proof in an action to *802 change custody awarded by a “noncon-sidered” decree, and must show that an award of custody to the parent would result in substantial harm to the child.
Borrowing the Second Circuit’s Tennessee v. Campbell[25] language and logic, the court focused on the parental primacy principle. The court also referred to La. C.C. art. 133’s limiting language, which permits nonparent custody only when custody to a parent would result in substantial harm to the child, emphasizing that despite authorizing custody awards to non-parents, the Article 133 revision |S4comments recognize the parent’s paramount right to custody over any nonpar-ent. Relying upon Article 133 Comment (b), the Third Circuit opined that the best interest of the child is often served by parental custody, even when the child has been in a wholesome and stable environment with a nonparent, and proof of substantial harm is needed to show otherwise. Cutts, 931 So.2d at 470 (quoting Tennessee v. Campbell, supra.). The Third Circuit found that because a parent’s right to custody of his child is a “cornerstone of the continuing institution of the American family,” the nonparent should bear the burden of proof in an action to change custody awarded by consent decree and must show that an award of custody to the parent would result in substantial harm to the child. Id. The parent in this circumstance is not required to show a material change in circumstances or that a change is in the best interest of the child.
Three years later, however, in Dalme v. Dalme, supra, the Third Circuit seemed to revert to its earlier standard and burden of proof enunciated in the Mayeux case.
In Dalme, the child’s biological father appealed the trial court’s denial of his request for a change of custody after two consent agreements that awarded domiciliary custody to the child’s maternal grandparents. In affirming the trial court’s judgment, the court stated:
It is significant that there have been two custody decrees on this matter and that both of them have been consented to by Appellant [the father]. This court has noted that such agreements may only be modified when there is a showing that there has been a material change in circumstances and that the modification would be in the best interest of the minor child.
Id. at 480.
|ssThe Dalme panel cited pre-Cutts case law to support its enunciated standard and burden of proof. See Matter of Landrum, 97-826, p.4 (La.App. 3 Cir. 12/10/97), 704 So.2d 872, 874.
The court discussed the father’s argument that the jurisprudence applied by the trial court in this case stood in contrast to La. C.C. art. 133, responding:
The article recognizes the parent’s paramount right to custody of the child and applies a heavier burden than that required in modifying a consent decree— thus presenting two distinct standards that could be applied in the present matter. We find, however, that the same result should be reached under both tests. So long as awarding custody to the parent would be detrimental to the child and awarding custody to the nonparent would serve the child’s best interests, an award of custody to the Appellees would be appropriate in this case.
Dalme, 21 So.3d at 481.

*803
First Circuit

Millet v. Andrasko, 93-0520 (La.App. 1 Cir. 3/11/94), 640 So.2d 368, is a much cited First Circuit iteration on this issue. In Millet, a father sought sole custody of his child after he previously consented to give temporary sole custody to maternal family members, reserving to himself specific visitation rights. The trial court denied the father’s rule for sole custody, awarding joint custody of the minor child to the father and the nonparents, with the non-parents being designated as domiciliary parents. On appeal, the First Circuit adopted the pre-Jones, pre-Tennessee v. Campbell, Second Circuit Bergeron “change in circumstances” approach, finding that in a subsequent proceeding to change custody awarded by a “nonconsid-ered decree,” a parent seeking the change bears the burden of proof and the standard is the same as is in custody disputes between parents. Millet v. Andrasko, supra at 371 (citing Hill v. Hill, 602 So.2d 287 (La.App. 2 Cir.1992)). In so holding, the court explained that “[t]he concerns of Bergeron are equally applicable in custody disputes between nonparent and parent. Therefore, this court | ¡^reverts to Bergeron for the requisite burdens of proof in cases involving a modification of child custody between a parent and a nonparent.” Id. See also, Robert v. Gaudet, 96-2506 (La.App. 1 Cir. 3/27/97), 691 So.2d 780.

Fourth Circuit

In re Hardimon, supra, is the sole Fourth Circuit case addressing this subject. In Hardimon, the Fourth Circuit affirmed the trial court judgment awarding joint custody to the father and maternal grandmother with the grandmother as domiciliary custodian. The original decree from which the father sought modification was a non-considered decree. In arriving at a standard and burden of proof, the Hardimon court followed the Bergeron-based approach taken by the First Circuit, adopting the Bergeron rationale that an end to litigation is desirable.
V.
Because Louisiana Law on this question is conflicting as to both the standard and burden of proof, reviewing the manner in which the other states address these issues may be of benefit.
All states respect the constitutionally-protected liberty interest of the parent. The southern states examined below all initially presume that it is in a child’s best interest to be domiciled with a natural parent. See Clark v. Wade, 273 Ga. 587, 544 S.E.2d 99 (2001); Matter of Guardianship of W.L., 2015 Ark. 289, 467 S.W.3d 129 (2015); Taylor v. Meek, 154 Tex. 305, 276 S.W.2d 787 (1955). However, this presumption may be rebutted generally by unfitness, a showing that custody in the natural parent would bring substantial harm upon the child, abandonment, and forfeiture of parental rights. See e.g. Grant v. Martin, 757 So.2d 264 (Miss.2000); Denise v. Tencer, 46 Va.App. 372, 617 S.E.2d 413 (2005); Dyer v. Howell, 212 Va. 453, 184 S.E.2d 789 (1971);
|S7Thus, the nonparent third party seeking initial custody bears the burden of proof. Generally, the best interest of the child is the predominant factor, in any effort to place custody with a nonparent. However, as discussed below, in most states, the standard changes and the burden shifts after a final judgment awarding custody to a nonparent, generally, irrespective of whether the judgment is a consent or considered decree. See, e.g., Tenn. Code Ann. § 36-6-101(a)(2)(B).
There are two potential rules. The first holds that if a parent gives the child up voluntarily in a consent decree, he or she loses the presumption which is the product of the constitutionally protected right to *804 parent the child, and must prove that the change will be in the best interest of the child. The vast'majority of states follow this rule. See, Jeff Atkinson, Modem Child Custody Practice § 9-9 (2d ed Matthew Bender). The basis for this standard and burden of proof is the importance of stability in a child’s life, particularly in the home environment. See, e.g. Ex parte McLendon, 455 So.2d 863 (Ala.1984); Bethany v. Jones, 2011 Ark. 67, 378 S.W.3d 731 (2011); Grant v. Martin, 757 So.2d 264 (Miss.2000).
The second rule presumes that even when the parent has given up custody of the child voluntarily, in an adjudicated proceeding, it is still within the best interest of the. child to live with his or her natural parents, and the nonparent third party seeking to retain custody in a subsequent custody contest must bring evidence; to rebut that presumption. This is the minority rule.
Reviewing the standard and burden of proof applied in this circumstance in twelve southern states, in an overwhelming number of states, the parent does not enjoy the full constitutional right to parent in the face of an earlier custody judgment awarding custody to a nonparent.[26] Further, immost southern states,- the [ssmoving parent bears the burden of proving a change of circumstances in the child’s current custody arrangement, and that the child’s best interest would be served in moving custody to the parent. In Florida, the parent bears the burden of proving that he is fit and that custody with him will not be detrimental to the child. In South Carolina, the non-moving nonparent bears the burden of proof. In Georgia, when the judgment in question is not a considered judgment, the nonparent, likewise, bears the burden of proof. In Georgia, however, that burden shifts after a considered judgment. Three states, also recognize the doctrines of psychological parent, de facto custodian, in loco parentis, or waiver of parental rights. Application of these doctrines creates a more nuanced approach.[27]

Alabama

In Alabama, parental preference applies in the initial custody determination between a parent and a nonparent. However, the burden and standard of proof shifts in a modification contest after a nonparerit has been awarded custody in either a consensual or considered decree. Then, the parent bears the burden'of proving first that a material change of circumstances affecting the child’s welfare has occurred since the most recent custody decree, and, second that a custody change to the parent will promote the child’s best interest. Ex parte McLendon, supra.
In Ex parte McLendon, where a parent who had previously voluntarily relinquished custody, to a grandparent, thereafter sought to regain custody, the Alabama Supreme Court pronounced:
- A natural parent has a prima facie right to the custody of his or her child. However, this presumption does not apply after a voluntary | ^forfeiture of custody or a prior decree removing custody from the natural parent and awarding it to a nonparent....
[[Image here]]
The correct standard in this case is:
Where a parent has transferred to another [whether it be. a nonparent or other parent], the custody of h[er] infant child by fair agreement, which has been acted upon by the other person to the *805 manifest interest and welfare of the child, the parent will not be permitted to reclaim the custody of the child, unless she can show that a change of the custody will materially promote h[er] child’s welfare.
[[Image here]]
Furthermore, [This] is a rule of repose, allowing the child, whose welfare is paramount, the valuable benefit of stability and the right to put down into its environment those roots necessary for the child’s healthy growth into adolescence and adulthood. The positive good brought about by the modification must more than offset the inherently disruptive effect caused by uprooting the child. Frequent' disruptions are to be condemned.
Ex parte McLendon, 455 So.2d at 865.

Arkansas

In an initial Arkansas custody dispute, as between a parent and a nonparent, custody is awarded to the parent unless that parent is incompetent or unfit to have custody of the child. Bethany v. Jones, 2011 Ark. 67, 378 S.W.3d 731 (2011); Faulkner v. Faulkner, 2013 Ark.App. 277, 2013 WL 1857687; citing Jones v. Strauser, 266 Ark. 441, 585 S.W.2d 931 (1979). However, as in other states, parental rights are not proprietary. Therefore, parental preference is not absolute, and is subject to the parent’s related duty to care for and protect the child. The law secures the parent’s preferential rights only as long as the parent discharges his obligations and may fall to “the polestar” and paramount consideration — the best interest of the child. Faulkner, citing Dunham v. Doyle, 84 Ark.App. 36, 129 S.W.3d 304 (2003). The child’s best interest may “overcome the parental preference when a child is left in the care of a nonparent for a substantial period of time.” Coffee v. Zolliecoffer, 93 Ark.App. 61 at 69, 216 S.W.3d 636 (2005).
|4nArkansas also ascribes to the doctrine of in loco parentis, which may overcome parental preference, even in the initial custody contest, elevating the nonparent to equal status with the parent. Bethany v. Jones, 2011 Ark. 67, 378 S.W.3d 731. In loco parentis is “in place of a parent; instead of a parent; charged factitiously with a parent’s rights, duties, and responsibilities.” Robinson v. Ford-Robinson, 362 Ark. 232, 239, 208 S.W.3d 140, citing Black’s Law Dictionary (5th ed. 1979). When a child lives with a nonparent who constantly and consistently cares for the child’s physical, financial, and emotional needs, assuming all of the duties and responsibilities of a parent, that nonparent stands in loco parentis. Bethany v. Jones, supra. Robinson v. Ford-Robinson, supra. The Arkansas Supreme Court has treated stepparents, same sex partners and grandparents as standing in loco par-entis. Bethany v. Jones, supra; Robinson v. Ford-Robinson, supra. Therefore, grandparents who have been found to stand in loco parentis stand in equal footing with the parent, as opposed to grandparents who do not enjoy this status. In an action to modify a custody decree which awarded custody to a nonparent found to be in loco parentis, the court applies the same standard and burden of proof as in an action to modify custody between two parents.
In an action for modification of a final consensual custody decree which awarded custody to a nonparent who is not found to be in loco parentis, the parental preference is not wholly forfeited. However, the standard and burden of proof shifts — “its [parental preference] effect is so diminished that the parent bears the burden of showing a change of circumstances.” Rychel v. Williams, 2000 WL 1258428, at *3, *806 2000 Ark.App. LEXIS 540 at 7 (Ark.App.2000). In deciding whether to modify a custody decree, the court must first determine whether there has been a material change in circumstances of the parties since the most recent custody decree. If a material change of circumstances has occurred, the court must then decide the custodial placement. In |41making this decision, the primary consideration is the welfare and best interest of the children involved. Rychel v. Williams, supra.

Florida

In Richardson v. Richardson, the Florida Supreme Court announced the standard and burden by which a court must judge a custody dispute between a parent and a nonparent. 766 So.2d 1036 (Fla.2000). The nonparent bears the burden of proving that custody in the parent will be detrimental to the welfare of the child. In announcing this standard, the court opined that the test must include consideration of the right of a natural parent “to enjoy the custody, fellowship and companionship of his offspring.” Id. at 1039.[28]
However, in a parent’s subsequent action to modify a previous custody award to a nonparent, the burden shifts. Then, the parent bears the burden of proving that he is fit and that a change in custody will not be detrimental to the child. Reiner v. Wright, 942 So.2d 944 (Fla. 5th DCA 2006); Ward v. Ward, 874 So.2d 634 (Fla. 3rd DCA 2004). The Florida courts have specifically rejected the substantial change of circumstances/best interest of the child test more prevalently applied in the other southern states. See Davis v. Weinbaum, 843 So.2d 290 (Fla. 5th DCA 2003).
| ^Georgia
In Georgia, a limited class of persons, including grandparents, has standing to seek custody. O.C.G.A. § 19-7-1. In an initial custody dispute between a parent and a nonparent, the nonparent bears the burden of proving that the best interest of the child supports an award of custody to the nonparent. While the best interest of the child is the overriding consideration, the nonparent must overcome a three part rebuttable presumption that it is in the child’s best interest to remain in the custody of the parent: (1) the parent is a fit person entitled to custody, (2) a fit parent acts in the best interest of his or her child, and (3) the child’s best interest is to be in the custody of a parent. Clark v. Wade, 273 Ga. 587, 544 S.E.2d 99, 103 (2001). To overcome the parental presumption, the nonparent must first prove, by clear and convincing evidence, that parental custody would harm the child; then, that an award of custody to the nonparent will best promote the child’s health, welfare and happiness. Id at 108.
In subsequent modification actions, however, two standards apply, depending upon the nature of the judgment from which the modification is sought. Where modification is sought from a nonparent consent decree, the nonparent bears the burden of *807 proof enunciated in Clark v. Wade, Supra. See Lopez v. Olson, 314 Ga.App. 533, 724 S.E.2d 837 (2012). On the contrary, following a considered judgment awarding custody to a nonparent, the roles reverse. The nonparent has the prima fade right to custody. The parent then must prove by clear and convincing evidence his or her present fitness and that it is in the best interest of the child that custody be changed. Id. at 539, 724 S.E.2d 837.

Kentucky

In Kentucky, in initial custody contests between a parent and a nonparent, parental primacy exists, except upon one of three specific findings. The nonparent Improves by clear and convincing evidence: 1) the nonparent is a de facto custodian, 2) the parent is unfit, or 3) the parent has waived some or all of his parental rights. Upon any of these findings, the parent and nonparent receive equal consideration and the best interest of the child standard applies. KRS 405.020; KRS 403.270; Greathouse v. Shreve, 891 S.W.2d 387 (Ky.1995).
A de facto custodian is a person who the court has found: 1) has been a child’s primary caregiver and financial supporter; 2) with whom the child has resided for a period of six months if the child is under three and for one year if the child is more than three years old. KRS 405.020; KRS 403.270; J.L.A. v. S.C., 2103 Ky.App. Unpub. LEXIS 215.
Kentucky also ascribes to the doctrine of “waiver of parental rights.” A legal waiver is a “voluntary and intentional surrender or relinquishment of a known right, or ... advantage which the party at his option might have demanded or insisted upon.” Greathouse v. Shreve, supra at 390. “Waiver is unilateral, resulting as a legal consequence from some act or conduct of [the] party against whom it operates, and no act of [the] party in whose favor it is made is necessary to complete it.” Id. Because waiver of the parent’s superior right to child custody is a right with both constitutional and statutory implications, proof must be clear and convincing. While no formal or written waiver is required, statements and supporting circumstances must be equivalent to an express waiver to meet the burden of proof. Id. at 391; Temple v. Temple, 298 S.W.3d 466 (Ky.App.2009) Waiver of the parent’s superior right to custody need not be exercised to the exclusion of the natural parent. Mullins v. Picklesimer, 317 S.W.3d 569 (Ky.2010). Therefore, when a parent voluntarily gives up part of his or her custody right by joint custody to a nonpar-ent, the parent has waived his or her superior parental right. Id.
144As to modification, KRS 403.340 specifies that modification of a custody decree is extraordinarily limited for 2 years after any decree. After that, when the original consensual or considered custody decree awarded some or all of the custody to the nonparent, modifications occur only when the parent proves by clear and convincing evidence that a change of circumstances of the child or custodian has occurred and modification is necessary to serve the best interests of the child. The statute sets out particular factors for the court to consider in addressing the question of change of circumstances.

Mississippi

The Mississippi Supreme Court in Grant v. Martin, in which a parent who had previously voluntarily relinquished custody to a grandparent and then sought to regain custody, pronounced a new standard and burden of proof:
Because stability in the lives of children is of such great importance, we have carefully weighed the impact of establishing an exception, or new standard for such instances. While we do not want *808 to discourage the voluntary relinquishment of custody in dire circumstances where a parent, for whatever reason, is truly unable to provide the care and stability a child needs, neither do we want to encourage an irresponsible parent to relinquish their child’s custody to another for convenience sake, and then be able to come back into the child’s life years later and simply claim the natural parents’ presumption as it stands today. A .natural parent who voluntarily relinquishes custody of a minor child, through a court of competent jurisdiction has forfeited the right to rely on the existing natural parent presumption. A natural parent may reclaim custody of the child only upon showing by clear and convincing evidence that the change in custody is in the best interest of the child. This new rule not only reaffirms that the polestar consideration in all child custody cases is the best interest of the child, but also gives the chancellor the authority to make a “best interest” decision in voluntary relinquishment cases without being fettered by the presumption in favor of the natural parents which applies in other child custody cases.
Grant v. Martin, 757 So.2d 264, 266 (Miss.2000).
| i?,North Carolina
In North Carolina, once a custody order granting custody to a nonparent exists, the parental primacy rule announced in Petersen v. Rogers, 337 N.C. 397, 445 S.E.2d 901 (1994) does not apply. Bivens v. Cottle, 120 N.C.App. 467, 469, 462 S.E.2d 829 (1995). Rather, N.C. GemStat. § 50-13.7 applies:
An order of a court of this state for custody of a minor child may be modified or vacated at any time, upon motion in the cause and a showing of changed circumstances by either party or anyone interested.
The moving parent must prove: 1) there has been a substantial change in circumstances affecting the welfare of the child; and 2) a change in custody is in the best interest of the child. Bivens v. Cottle. Id. at 469, 462 S.E.2d 829.

Oklahoma

In Oklahoma, in an action to modify a previous consent or considered judgment awarding custody to a nonparent, the moving parent bears the burden of proving: 1) subsequent to the judgment there has been a permanent, substantial and material change of conditions which directly affect the best interests of the minor child; and 2) as a result of the change of conditions, the minor child would be substantially better off, with respect to mental and moral welfare, if the requested change in custody is ordered. Johnson v. Johnson, 1984 Ok 19, 681 P.2d 78 (Okla.1984). This Court stated:
[Wjhen a parent has, either by abandonment or contract, surrendered his present legal right to custody of his child, in all controversies subsequently arising respecting its custody, the matter of primary importance is the interest and welfare of the child. To this right the parent’s preferential right to the custody of his child must yield.
Id. at 80.
| ¿South Carolina
South Carolina follows the minority approach. When a noncustodial parent seeks to regain custody from a custodial third party, the best interest of the child is paramount. However, the parent enjoys superior rights over a nonparent. The parent bears the initial burden of proving that he or she is fit, able to properly care for the child, provide a good home. Upon a finding of parental fitness, a rebuttable *809 presumption arises that it is in the best interest of the child to be with its biological parent. Moore v. Moore, 800 S.C. 75, 386 S.E.2d 456 (1989); Baker v. Wolfe, 333 S.C. 605, 510 S.E.2d 726 (1998). Thereafter, the custodial nonparent bears a substantial burden of proving that the child’s best interest lies with the nonparent.
In making these decisions the court considers the following criteria in a case by case analysis:
1. The amount of contact,.in the form of visits, financial, support of both, which the parent had with the child while it was in the care of a third party.
2. The circumstances under which ‘temporary relinquishment occurred. '
3. The degree of attachment between the child and the temporary custodian.
Middleton v, Johnson, 369 S.C. 585, 633 S.E.2d 162 (Ct.App.2006).
Where the parent does not prove his or her fitness, custody is maintained or awarded based strictly upon the best interest of the child. See also Hogan v. Platts, 312 S.C. 1, 430 S.E.2d 510 (1993); Malpass v. Hodson, 309 S.C. 397, 424 S.E.2d 470 (1992).
South Carolina, however, also statutorily recognizes the psychological or de facto parent doctrine. S.C. Code Section 20-7-420(20) grants the court jurisdiction to award custody of the child to the child’s parent or “any other proper person or institution.” Pursuant to that statute, nonparents may bring an action for custody of a child. Kramer v. Kramer, 323 S.C. 212, 473 S.E.2d 846 (Ct.App.1996). In Middleton v. Johnson, the South Carolina Court of Appeals analyzed the doctrine and, adopting the Wisconsin analysis, laid out a four-prong test for determining whether a person is a psychological parent. In order to demonstrate the existence of a psychological parent-child relationship, the petitioner must show:
1. The biological or adoptive parent[s] consented to, and fostered, the petitioner’s formation and establishment of a parent-like relationship with the child;
2. The petitioner and the child lived together in the same household;
3. The petitioner assumed obligations of parenthood by taking significant responsibility for the child’s care, education and development, including contributing towards the child’s support, without expectation of financial compensation;
4. The petitioner has been in a parental role for a length of time sufficient to have established with the child a bonded, dependent relationship parental in nature,
Before custody can be awarded to a nonparent over a parent’s objection, however, there must be evidence of compelling circumstances to overcome, the presumption that the parental decision is in the child’s best interest. Middleton v. Johnson, Supra at 171.

Tennessee

The Tennessee Supreme Court in Blair v. Badenhope held, in a case in which a parent, who had voluntarily relinquished custody to a grandparent, sought to regain custody held:
[A] natural parent cannot generally invoke the doctrine of superior parental rights to modify a valid order of custody, even when that order resulted from the parent’s voluntary consent to give custody to the nonparent. Instead, a natural parent seeking to modify a custody order that grants custody to a nonparent must show that a material change of circumstances has occurred, which *810 makes a change in custody in the child’s best interest.
Blair v. Badenhope, 77 S.W.3d 137, 147 (Tenn.2002).
| ¿¿Texas
The Texas Supreme Court, in Taylor v. Meek, a case in which custody was originally awarded to the maternal grandparents and the father later sought modification held:
The first judgment at the time it was entered was res adjudicata of the question of the child’s best interest and of the custody. So it cannot now be questioned that at that time it was in the best interest of the child to award custody to the grandparents. In determining the question of the child’s best interests, there is this difference between the first award of custody and a change of custody. Because a change of custody disrupts the child’s living airangements and the channels of a child’s affection, a change should be ordered only when the trial court is convinced that the change is to be a positive improvement for the child. The paramount right of a natural parent to a child comes from a legal presumption that to be raised by its natural parents is to the child’s best interest. This presumption is based upon the natural affection usually flowing from parentage. Although this presumption should be considered by the trial judge in weighing the evidence, it cannot be controlling in the face of a final judgment to the contrary, and, whatever effect such a presumption may have in an original custody action, it cannot control a suit to change custody. Taylor v. Meek, 154 Tex. 305, 276 S.W.2d 787, 790 (Texas 1/12/55) See also In the Interest of Ferguson, 927 S.W.2d 766 (1996)
Further, the factors set forth in Tex. Fam. Code Ann. § 156.101 provide the standard: a court may modify a custody order if the circumstances of the child, the managing conservator, or possessing conservator have materially changed since the date of the earlier order’s rendition and the appointment of a new managing conservator is in the child’s best interest.

Virginia

In Virginia, a parent who has voluntarily agreed to joint custody with a grandparent is not clothed in the presumption generally accorded to natural parents in a dispute with nonparents because his custodial rights have been altered in the earlier consent judgment. Denise v. Tencer, 46 Va.App. 372, 393, 617 S.E.2d 413 (2005), McEntire v. Redfern, 217 Va. 313, 227 S.E.2d 741 (1976), and Watson v. Shepard, 217 Va. 538, 229 S.E.2d 897 (1976).
In Virginia, the noncustodial parent seeking modification bears the burden of proof. The standard of proof is the two pronged change of circumstances/best interest of the child test. Denise v. Tencer, supra.
VI.

The Standard and Burden of Proof in This Circuit in Actions to Modify a Previous Consent Decree Awarding a Custody Interest to a Nonparent

We conduct our analysis through the lens of the two competing constitutional liberty interests, the child’s substantive right to the custodianship that best promotes his welfare, and the parent’s right to the care, custody and management of his child. Troxel v. Granville, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); In re Adoption of B.G.S., 556 So.2d 545 (La.1990); Bergeron v. Bergeron, 492 So.2d 1193 (La.1986).
*811 While the child’s right to a custodial arrangement which promotes his welfare arises at birth, parents acquire the substantial protection of their interest in a child’s custody under the Due Process clause by demonstrating a full commitment to the responsibilities of parenthood by “‘[coming] forward to participate in the rearing of his child.’ ” Lehr v. Robertson, 463 U.S. 248, 261, 103 S.Ct. 2985, citing Caban v. Mohammed, 441 U.S. 380, 391, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979). The mere existence of a biological link does not merit equivalent constitutional protection. Lehr v. Robertson, supra.

The Burden of Proof

It goes without saying that in an initial custody contest, the nonparent bears the burden of proving by clear and convincing evidence that a custody award to the | ¡^parent would cause substantial harm to the child and that the best interests of the child are served by awarding custody to the nonparent. La. C.C. art. 133; Ramirez v. Ramirez, supra at 9; Duplessy v. Duplessy, 12-69 (La.App. 5 Cir. 06/28/12), 102 So.3d 209, 213. It is equally well settled that a parent seeking to modify a considered decree awarding custody to a nonparent bears the heavy burden set forth in Bergeron v. Bergeron, supra.
Three of the four Louisiana Circuit Courts which have addressed the question before us, as well as a great majority of the southern states, have held that parents forgo the legal presumption that they aré the proper custodian for the child when they enter into a consent agreement divesting them of some or part of the child’s custody. Millet v. Andrasko, supra; In re Hardimon, supra; Jones v. Coleman, supra; Ex parte McLendon, supra; Rychel v. Williams, supra; Greathouse v. Shreve, supra; Grant v. Martin, supra; Bivens v. Cottle, supra; Johnson v. Johnson, supra; Blair v. Badenhope, supra; Taylor v. Meek, supra; Denise v. Taylor, supra.[29]
There are sound policy reasons for placing the burden of proof on the modification-seeking parent. First, stability in a child’s life is essential. Maintaining a child in the safe and secure home in which he or she has put down roots and formed family bonds is vital to insuring that the child will mature into a happy, physically and mentally healthy and productive adult. Among the factors Louisiana courts are directed to consider in determining the best interests of the child is, “the length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.” La. C.C. Art. 134; Ramirez v. Ramirez, supra. Grant v. Martin, supra.
| siNext, the parental primacy doctrine is not based solely upon the parent’s liberty interest,, but also upon the presumption that parents intend to act in the best interest of their child. Therefore, we must assume that at the time parents agree to relinquish all or part of their child’s custody to a nonparent, the parents believe that they are acting in the child’s best interest. Taylor v. Meek, supra.
Finally, while we do not seek to discourage the voluntary relinquishment of a custodial interest in dire circumstances where a parent is truly unable to provide the care and stability a child needs, neither do we want to encourage irresponsible parents to relinquish their child’s custody .to another for convenience sake, only to disrupt the child’s life years láter with a simple claim *812 of parental primacy. Grant v. Martin, supra.
Therefore, we hold that the burden of proof in an action to modify a previous consent decree awarding all or part of a child’s custody to a nonparent lies with the modification-seeking parent.

The Standard of Proof

After thoroughly analyzing the cases which have addressed the standard of proof in this instance, we agree with the Louisiana Second Circuit in its Jones v. Coleman analysis.. The Change of. Circumstances/Best Interest of the Child test accepted by the First and Fourth Circuit Courts initially arose in the context of two parents vying for custody. In that .context, there is an expectation of two fit parents and no expectation of a risk of “substantial harm” to the child. The generally expected outcome is some sort of shared or joint custody arrangement between two fit parents. In contrast, a custody action brought by a nonparent may only arise pursuant to La. C.C. Art. 133 when a threat of “substantial harm” to the child looms. Presuming that parents will always attempt to act in the best interest of their child, parents who voluntarily relinquish all or part of their custody to a [fignonparent are. judicially admitting that they are not currently fit, i.e. capable of sole custody of their child, or that they have abandoned the child, and that custody with that parent'presents a threat of substantial harm to the child. The parent is also judicially admitting that the nonpar-eht is able to provide the child with' a wholesome and stable environment which is in the child’s best interest.
Further, while the parent’s rehabilitation and establishment of a rich and full relationship with the child is an important goal, that goal cannot be achieved at the expense of the child’s “wholesome and stable” environment. Visitation tailored to the particular and evolving circumstances of each case, including the’ parent’s establishment of a nurturing role in the child’s life, will accomplish this goal.
Finally, the Louisiana legislature, when it enacted La. C.C. art. 133, enunciated the two elements necessary to establish non-parent custody: a threat of substantial harm to the child and the ability of the nonparent to provide an adequate and stable environment. Because these two necessary elements existed when the nonpar-ent custodial interest was awarded, and must presume to continue until proven otherwise, any subsequent modification action must likewise direct its attention to these two crucial elements. Any other standard of proof would conflict with the overarching concern: the best interest of the child.
 Therefore, we hold that an initial consent judgment under Article 133, awarding joint custody to a parent and nonparent with the nonparent being domiciliary, is a determination of the unfitness of the parent and the fitness of the non-parent to provide an adequate and stable environment for the child. In any proceeding, thereafter to- grant expanded custody of the child to the parent, and to thereby modify or end the nonparent’s custody, the parent shall have the burden of proof and the dual tests of Art. 133, 131, and 134 shall apply. The parent must first prove he has been rehabilitated to a fit parent, thereby eliminating the threat of the ^“substantial harm” to the child which existed at the time of the original consent judgment. Second, the parent must prove that the adequate and stable environment in which the child was placed with the nonparent as a result of the original consent judgment has materially changed. In the absence of such a change, the parent’s claim to modify the nonparent’s custody of *813 the child shall not prevail. Finally, if the parent has met this initial two-prong burden, the parent must prove that the best interest of the child lies in custody with the parent. Rehabilitation of the parent alone shall afford the parent appropriate visitation.
Returning.to the first prong of the dual test, as we discussed above, the concept of substantial harm includes parental fitness, neglect, abuse, and abandonment of rights, and is broad enough to include, “any other circumstances, such as prolonged separation of the child from the natural parent, that would cause the child to suffer substantial harm.” Ramirez v. Ramirez, supra, at 16. While a natural father need not live continuously .with his child to be a fit parent, neither financial support nor sporadic visits alone constitute the substantial relationship which renders a parent fit. A.substantial relationship is a continuous and ongoing interchange between the parent and child in which the parent shoulders his responsibility for the child’s financial, emotional, spiritual, and physical wellbeing.
A parent who abandons his child is considered unfit. Abandonment is the voluntary relinquishment of rights, title, or claim to property that rightfully belongs to the owner of the property. Black’s Law Dictionary, 2nd. Ed. Even in termination of parental rights and adoption cases— where the risk to the parent’s relationship to the child is much greater than here— abandonment is defined as “placing [the child] in the physical custody of a nonpar-ent” or failure, to maintain ^contact or provide significant contributions to the child’s care and support for any consecutive, six-month period. La. Ch.C. art. 1015(4).
In the context of this case, where a parent must prove rehabilitation, as discussed above, to demonstrate his fitness as a parent, neither sporadic visits, nor occasional limited support payments or gifts demonstrate an intent to assume the mantel of parenthood. Further, in considering the parent’s consistent support of the child, the absence of a support order does not excuse failure to .support a child within the parent’s means. State v. T.P.M., 06-530 (La.App. 5 Cir. 11/28/06), 947 So.2d 751; State ex rel. T.M.H., 99-433 (La.App. 5 Cir, 11/30/99), 748 So.2d 1216; In re McLarrin, supra.
In this case, the trial court was faced with the difficult task of determining the applicable standard and burden of proof on a complex issue with constitutional implications in a situation in which this court had not spoken, and the other circuits are divided. The trial court applied the standard and burden of proof it discerned to be correct, placing the burden of proof on the nonparent custodial grandmother.
In our holding today, however, we have announced a different standard of proof, and placed the burden of proof upon a different party. Therefore, we find that the trial court’s well intended error of law materially affected the outcome of the case and implicated the substantial rights of the child and the custodial grandmother. Accordingly, we vacate the trial court’s January 27, 2015 judgment awarding sole custody to Francisco and reinstate the July 2013 stipulated judgment awarding joint custody to Kathy and Francisco, with Kathy designated as the domiciliary parent.
JaVH.
The Mother
In this appeal, Tracie alleges that the trial court erred in its January 27, 2015 judgment in failing to recognize her visitation rights set forth in the stipulated judgment. In her appeal brief, Tracie complains that the trial court erred in finding *814 that she was not a party to the issues before the court.
As a threshold matter, we address first whether the trial court erroneously held, in effect, that Tracie was not a party to the issues before the trial court. In his petition to annul, Francisco named Tracie as a defendant, praying that he be awarded sole custody “... with reasonable and supervised visitation to the mother.” Tracie was served, ordered to show cause why the petition should not be granted, and to appear both at a Hearing Office Conference and before the district court.
Tracie filed neither pleadings nor request for relief in this matter before the trial court. She did not seek to regain her joint custody of David. She also did not seek to litigate her visitation rights. This appears not to be because Tracie was not a party but, rather, because before the trial court’s January 27, 2015 Judgment and February 26, 2015 Reasons for Judgment, Tracie had no notice that she was at risk of losing her visitation rights. Francisco did not expand on his original prayer regarding Tracie’s visitation in either his pre-trial pleadings or in his counsel’s argument at trial.
At trial, Francisco testified that he did not seek to upset Tracie’s visitation rights.[30] The court, while ruling on Francisco’s counsel’s relevancy objections, held that Tracie’s visitation was not before him. Francisco’s attorney cross-examined Tracie on this issue, stating into the record that Francisco was not seeking to adjust Tracie’s visitation rights, and eliciting from Tracie her understanding that this was the case. With this statement, Francisco abandoned the visitation issue. Lipsey v. Dardenne, 07-1487 (La.App. 3 Cir. 11/29/07), 970 So.2d 1237, 1245; Rabalais v. St. Tammany Parish Sch. Bd., 06-0045 c/w 06-0046 (La.App. 1 Cir. 11/3/06), 950 So.2d 765.
A “party” is defined as “one by or against whom a lawsuit is brought.” An “interested party” is defined as “a party who has a recognizable stake (and therefore standing) in a matter.” Black’s Law Dictionary 1232 (9th ed. 2009). Here, Tracie was named as a defendant in Francisco’s petition. Moreover, Tracie had a recognizable stake in the matter — her visitation rights. While the trial court did not explicitly hold that Tracie was not a party to the proceeding, upon several evidentiary objections by Francisco’s attorney, arguing that certain evidence was not relevant as “Tracie was declared unfit in the stipulated judgment” and “hasn’t filed any sort of pleading to get this back into play,” the trial court sustained the objection.
We resolve any ambiguity surrounding this issue and conclusively find that Tracie is a party to this action.
Following the July 8, 2015 visitation hearing, ordered by this Court, the trial judge awarded Tracie limited, supervised visitation of four hours every other weekend. The judgment further provided that, should the parties fail to agree on a third-party supervisor, Francisco would supervise Tracie’s visitation. Tracie has filed a supervisory writ with this Court seeking review of that July 8, 2015 judgment, which we have referred to the merits of this appeal and address herein.
*815 Concerning Tracie’s visitation rights, La. C.C. art. 136 provides that a parent not granted custody or joint custody of a child is entitled to reasonable |R7visitation rights unless the court finds, after a hearing, that visitation would not be in the best interest of the child after consideration of the factors set forth in La. C.C. art. 134. Jones v. Coleman, supra at 163. The right of visitation is not without its limitations, and is always subservient to the best interests of the child. Maxwell v. LeBlanc, 434 So.2d 375 (La.1983).
Louisiana Civil Code article 136 Revision comment (b) states:
The first paragraph of this Article restates the test for parental visitation established in the leading ease of Maxwell v. LeBlanc, 434 So.2d 375 (La.1983).... Nevertheless, this Article is not intended to affect the Maxwell case, except for the court’s declaration that visitation is a “species of custody,” which is no longer strictly true, since visitation has an independent basis under this Article.
In the Maxwell case, the Supreme Court set forth nine factors by which a judge should be guided in deciding whether to deny or limit visitation. While these factors were not adopted word for word in the 1994 enactment of La. C.C. art. 134, the intent of each was incorporated in the twelve factors set forth in that article. The Supreme Court in Maxwell also held that the factors it set forth, like the current best interest factors, need not be applied mechanically. Maxwell, supra at 378-379. Today, the' court must be guided by the La. C.C. art. 134 factors in arriving at a particular parent’s permitted visitation, in light of the child’s best interest.
The factors set forth in La. C.C. art. 134 to be considered in granting, denying, or limiting visitation, are as follows: (1) the love, affection, and other emotional ties between each party and the child; (2) 'the capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child; (3) the capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs; (4) the length of time the child has lived in a stable, adequate environment, | asand the desirability of maintaining continuity of that environment; (5) the permanence, as a family unit, of the existing or proposed custodial home or homes; (6) the moral fitness of each party, insofar as it affects the welfare of the child; (7) the mental and physical health of each party; (8) the home, school, and community history of the child; (9) the reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference[31]; (10) the willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party; (11) the distance between the respective residences of the parties; and (12) the responsibility for the care and rearing of the child previously exercised by each party.
Although each factor should be considered in determining visitation, the factors need not be applied mechanically. Maxwell, supra at 378-79. The noncustodial parent is entitled to reasonable visitation unless it is shown that visitation would seriously endanger the child’s mental, moral or emotional health. Harper v. Harper, 00-1425 (La.App. 5 Cir. 01/30/01), 777 So.2d 1275, 1278.
*816 In Harper, the divorced mother successfully obtained a modification of the father’s visitation, restraining him from overnight visits with the children while a person of the opposite sex to whom he was not married was present. On appeal, this court found the trial court committed legal error when it failed to make a specific best-interest analysis and finding upon which to base the visitation restriction and that this error nullified the trial court’s judgment. Id. at 1278.
The transcript from the July 8, 2015 hearing reflects that, at the conclusion of the hearing, the trial judge recessed. The trial judge did not return to the courtroom to render judgment; rather, his law clerk read the judgment into the | ^record without oral reasons assigned. There are no written reasons for judgment. Upon our review of the appellate record and the documents provided in connection with Tracie’s and Kathy’s supervisory writ applications to this Court, we find that the trial judge failed to make a “best interest” finding or analysis in modifying Tracie’s visitation. The omission of a specific best-interest finding with regard to modifying visitation is a legal error which nullifies the trial court’s judgment. Harper v. Harper, 00-1425 (La.App. 5 Cir. 1/30/01), 777 So.2d 1275, 1278.
Accordingly, the July 8, 2015 judgment awarding Trade supervised visitation is hereby vacated.
VIII.
David’s Best Interest
The predominant factor in every custody case is the child’s best interest. It is essential that the child’s best interest is addressed from the child’s perspective, not from the perspectives of the adults participating in the custody contest. Since 2013, David has experienced the disintegration of his already troubled mother with safety issues attendant to that disintegration, the introduction to his father and stepmother, and integration into his father’s life and family, and the disruption and eventual disintegration of the stable and wholesome environment in which he was raised for nine years. This summer he lived in a new home. Based upon Francisco’s trial testimony, we assume David did not engage in his customary summer activities and has been moved to a new school.
A thorough review of this record reveals that the parties involved in David’s life struggle with communication, with an understanding of the rights and responsibilities of the domiciliary parent, and with the concept of co-parenting.
IfioAs in this judgment we are returning David’s custody to the July 14, 2013 status quo, it is important that all parties understand the rights and responsibilities of the domiciliary parent.

Domiciliary Parent

The domiciliary parent is the parent with whom the child primarily resides, and who has full decision making authority affecting the child unless an implementation order otherwise provides. The domiciliary parent is, however, required to confer with the other parent when making major decisions. La. R.S. 9:335; 9:336; Griffith v. Latiolais, 10-0754 (La.10/19/10) 48 So.3d 1058; See also Evans v. Lungrin, supra at 733; McCaffery v. McCaffery, 13-692 (La.App. 5 Cir. 04/09/14), 140 So.3d 105. All major decisions made by the domiciliary parent are presumed to be in the best interest of the child. La. R.S. 9:335(B)(3). The non-domiciliary parent who opposes a major decision made by the domiciliary parent bears the burden of proving that the decision is not in the best interest of the child. La. R.S. 9:335(B)(3). Non-major decisions are not subject to judicial review. Griffith v. *817 Latiolais, supra, at 1069; Evans v. Lungrin, supra, at 733. Major decisions normally include decisions concerning major surgery or medical treatment, elective surgery, and schools attended, but not the day-to-day decisions involved in rearing a child, e.g. bedtimes, curfews, household chores, and the like. Griffith v. Lantiolais, supra, at 1069.
The _ domiciliary parent is obligated to exchange information with the other parent concerning the health, education, and welfare of the child. La. R.S. 9:336; Evans v. Lungrin, supra. The domiciliary parent, however, is not required to inform the other parent of the mundane, day to day events of life, such as a particular bed time, whether the child’s hair was washed that evening, what the |m child had for dinner, who the child played with that day, or what time the child was picked up from aftercare. Id.
Trial of this matter was conducted without the benefit of expert assistance. While the trial court, in its July 8, 2015 judgment, appointed a custody evaluator, we have now vacated that judgment. We strongly encourage the trial court to reappoint a custody evaluator of its choosing to assist the court, in an impartial manner, to sort through the thorny issues presented in this case.
On its own motion, the trial court may appoint a parenting coordinator, pursuant to La. R.S. 9:358.1 for a period, initially not to exceed one year and that period may be extended for good cause shown. A parenting coordinator provides a child-focused alternate dispute resolution process to assist parents to reduce conflict in order to protect the child from the impact of that conflict. Upon remand of this matter, this Court encourages the trial court and parties to consider the appointment of a parenting coordinator in this case. Additionally, in further considering the most important factor in this case — the child’s best interest — this Court encourages the trial court order the parties' to pursue individual counseling for David, Trade, Kathy, and Francisco.
CONCLUSION
Accordingly, for the reasons fully discussed in this opinion, the January 27, 2015 judgment of the trial court awarding sole .custody to Francisco is vacated. We reinstate the July 2013 stipulated judgment awarding Francisco and Kathy joint custody, with Kathy designated as the domiciliary parent, as well as the subsequent September 10, 2014 judgment concerning Francisco’s and Trade's child support obligations and the December 10, 2014 judgment concerning Francisco’s specified | ^visitation. We return David’s overall life situation to the July 13, 2013 status quo as amended by the September 10, 2014 and December 10, 2014 judgments.[32]
This opinion, vacating the January 27, 2015 judgment, renders the issues raised in Kathy’s writ application moot.[33] As to *818 Trade’s writ application, we hereby vacate the July 8, 2015 judgment.
We remand this matter to the district court.

JUDGMENT VACATED; REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.

LILJEBERG, J., concurs in part and dissents in part with reasons.
WINDHORST, J., concurs in part and dissents in part for the reasons assigned by LILJEBERG, J., and assigns réasons.

. The court in its February 26, 2015 Reasons for Judgment described the period between its January 27, 2015' judgment and the end of the 2014-2015 school yeár as a period in which to "ease the minor child’s custodial transition.” The judgment became executory at the end of the 2014-2015 school year.

. The trial court faced the difficult task of determining the applicable standard and burden of proof on a complex issue with'constitutional implications which this court had not addressed and on which the other circuits were divided. The trial court applied the standard and burden of proof it discerned to be correct.

.Jones v. Coleman, 44,543 (La.App. 2 Cir. 7/15/09), 18 So.3d 153.

. In accordance with Rule 5-2 of the Uniform Rules-Courts of Appeal, we will refer to the parties by their first names and surname initials to ensure the confidentiality of the minor involved in this proceeding.

. The minute entry indicates that the parties appeared on July 17, 2013, at which time a consent agreement was read into the record with Kathy's attorney ordered to prepare the judgment. The stipulated judgment reflects that the parties appeared before the court on July 18, 2013 and is signed "July 14, 2013.” Where a conflict exists between the minute entry and the judgment the judgment prevails. Neumeyer v. Schwartz, 97-995 (La.App. 5 Cir. 03/25/98), 708 So.2d 1258, 1262,

. The judgment indicates that it was signed by the Commissioner on July 14, 2013, but indicates that it was filed on August 14, 2013. The Judgment date prevails.

. At trial both Francisco and the B's testified that around Easter, 2014, Francisco's visitation was extended by agreement to every other weekend. This order extended that visitation from Sunday evening to Monday morning.

. While evidence of incidents which took place before the July 14, 2013 stipulated judgment are not relevant to proving a change of circumstances between July 14, 2013 and January 27, 2015, that evidence is relevant to determining the best interest of the child in awarding custody in the January 27, 2015 considered judgment complained of. Bowden v. Brown, 48,268 (La.App. 2 Cir. 5/15/13), 114 So.3d 1194; Harp v. Penney, 11-345 (La.App. 3 Cir. 12/07/11), 81 So.3d 1013; Smith v. Mulfur Smith, 92-0959 (La.App. 1 Cir. 3/5/93), 615 So.2d 926.

. Francisco shares Jake’s custody with Jake’s mother, alternating weeks to each parent. Regarding Jake's parentage, on direct examination Francisco allowed the inference that Jake was the child of his first wife, Kimberly S. Under cross examination, however, Francisco admitted that Jake’s mother was anoth *789 er Kimberly, Kimberly P. to whom he was not married

. Apparently when Olivia was between the ages of nine and eleven, Francisco freed her for adoption.

. This. statement is made in the May 28, 2013 joint custody petition, signed by Francisco.

. There is little evidence in the record regarding the details of Trade’s involvement in parenting David during this time period.

. David repeated Pre-K 4.

. At some point in the 2014-2015 school year, Francisco was ordered to pay 80% of David’s tuition.

. During the hearing, Francisco stipulated that David enjoyed an active lifestyle.

. Issues concerning Tracie are addressed in a separate section below concerning Trade’s visitation issues raised on appeal and in her subsequent writ application.

. Francisco testified that the molestation has caused David trauma, necessitating counseling for David. The record reflects that Francisco’s trip to both the therapist and to the district attorney's office, concerning the molestation allegations, occurred on Monday, July 6, 2015, after he received this court's June 30, 2015.order and two days before the July 8, 2015 visitation hearing. The therapist appointment was the child’s first appointment and lasted one hour.

. Co-resident Grandparents and Their Grandchildren: 2012, Population Characteristics; Ellis, Renee R, Simmons, Tavia, U.S. Dept. of Commerce Economics and Statistics Administration, U.S. Census Bureau, issued October, 2014; 2013 Pew Research Center Analysis of U.S. Census Bureau Data; Kathleen Meara, What’s in A Name? Defining and Granting A Legal Status to Grandparents Who Are Informal Primary Caregivers of Their Grandchildren, 52 Fam. Ct. Rev. 128, 129 (2014).

. A non-considered judgment is one in which no evidence is presented as to the fitness of the parents, such as one that is entered by stipulation or consent of the parties. In re Varner, 07-0656 (La.App. 1 Cir. 9/04/07), 962 So.2d 1233.

. A trial court renders a considered custody decree when it makes an award of permanent *799 custody after receiving evidence of parental fitness to exercise care, custody, and control of the children. Koussanta v. Dozier, 14-59 (La.App. 5 Cir. 5/21/14); 142 So.3d 202.

. The First and Fourth Circuit Bergeron/Ev-ans line of cases and the Third Circuit Cutis line of cases, discussed herein.

. See Bergeron standard discussed above. Where the original custody decree is a stipu *801 lated judgment, the party seeking modification must prove: (1) that there has been a material change of circumstances since the original custody decree was entered, and (2) that the proposed modification is in the best interest of the child. Evans v. Lungrin, supra.

. Millet v. Andrasko, supra at 370-71; In re Hardimon, supra at 993.

. The Third Circuit, in formulating this rule, relied upon the earlier Second Circuit rule pronounced in Tennessee v. Campbell, supra.

. As discussed above, the Second Circuit rejected its Tennessee v. Campbell enunciated standard in Jones v. Coleman, supra.

. Alabama, Arkansas, Kentucky, Mississippi, North Carolina, Oklahoma, Tennessee, Texas, Virginia.

. Arkansas, Kentucky, South Carolina.

. In Richardson, the Florida Supreme Court was called upon to opine on the constitutionality of Florida Statute § 61.13(7) 1999:
In any case where the child is actually residing with a grandparent in a stable relationship, whether the court has awarded custody to the grandparent or not, the court may recognize the grandparent as having the same standing as parents for evaluating what custody arrangements are in the best interest of the child.
Relying primarily upon the Florida Constitutional guaranty of a right to privacy which includes a parent’s fundamental right to rear his or her child free from governmental intrusion and control, the court found the statute to be unconstitutional on its face, in that it equated grandparents with the natural parent and permitted courts to determine custody disputes utilizing solely the “best interest of the child” standard without first determining detriment to the child.

. As discussed above, the Third Circuit has applied conflicting rules, with the burden of proof shifting, depending upon the rule applied in the particular case. Cutts v. Cutts, supra; Dalme v. Dalme, supra.

. Further, Francisco introduced into evidence an audio-recording in which he told David that he would never disrupt David's relationship with Tracie or Kathy. The documentation provided in connection with the writ application reflects that David has not been permitted to see Kathy since June. The record further reflects that Tracie’s visitation, contested in the trial court by Francisco after the January 27, 2015 judgment, was limited to supervised visitation for four hours every, other weekend.

. See Hanks v. Hanks, 13-1442 (La.App. 4 Cir. 4/16/14), 140 So.3d 208; Palazzolo v. Mire, 08-0075 (La.App. 4 Cir. 1/7/09), 10 So.3d 748.

. It is our hope that the transfer of David to Kathy will occur in a non-confrontational and conciliatory manner.

. The issues raised in Kathy’s supervisory writ application are rendered moot by way of our opinion. However, upon our review of Kathy’s writ application, we find that the trial judge committed an error of law in failing to conduct a best interest analysis or make a best interest. determination in denying her visitation.
Further, our review of the testimony at the July 8, 2015 visitation hearing as well as the January 27, 2015 trial, provides no factual basis upon which the trial judge could deny Kathy visitation. La. C.C. art. 136 provides that “[a] grandparent may be granted reasonable visitation rights if the court finds that it is in the best interest of the child.” Although La. R.S. 9:344 requires a showing of "extraordinary circumstances” to grant a grandparent visitation, that statute is inapplicable in this *818 case where the natural parents were never married and where neither parent is deceased, interdicted, or incarcerated. Following the 2012 amendment to La. C.C. art. 136(B), which separated a grandparent from any other relative or individual, a grandparent is no longer required to prove "extraordinary circumstances” in a case in which La. R..S. 9:344 does not apply.
In this case, where the grandparent has previously been granted custody of the child and the natural father has previously admitted, concerning his fitness, that custody of the child to him would result in substantial harm, La. C.C. art. 136 requires only a showing that visitation be in the child’s best interest. Based upon the facts presented at the trial and the visitation hearing, we can see no factual basis to deny visitation to Kathy, who has served as David’s primary caregiver for nine years.

. See Black’s Law Dictionary 1410 (6th Ed. 1990).